In re Richard MONTBLEAU, Debtor.

Conrad ZAMMITTI, Plaintiff,

v.

Richard MONTBLEAU, Defendant.

Bankruptcy No. 4–80–0063–G.
Adv. No. 4–80–0203–G.

United States Bankruptcy Court,
D. Massachusetts.

Aug. 7, 1981.

Bruce Newlands, Fisher & Helfenbein, Worcester, Mass., for defendant.

Leslie DiCicco, Worcester, Mass., for plaintiff.

## MEMORANDUM AND ORDER CONCERNING PLAINTIFF'S MOTION TO EXCEPT A DEBT FROM DISCHARGE

PAUL W. GLENNON, Bankruptcy Judge.

On November 18, 1980, the plaintiff, Conrad Zammitti, filed a complaint to except from discharge in bankruptcy the remainder of a debt owed by the debtor Richard Montbleau. 11 U.S.C. § 523. Testimony was taken at a hearing held on January 19, 1981, and both parties submitted suggested findings of fact. The following memorandum incorporates the findings of fact and law on the issues between these two parties.

### SUMMARY OF FACTS

In March, 1978 the plaintiff sought out the defendant about the possibility of making an investment in the defendant's business. The plaintiff, a retired businessman, had made repeated visits to the defendant's retail sneaker outlet, was impressed with the volume of business activity, and thought it might be a reasonable business investment. After several rejections by the defendant, they eventually agreed that the plaintiff would advance $5000 for the purchase of sneakers for summer sale. The defendant was to repay the "loan-investment" out of the receipts from the sale of the sneakers with the profit to be divided equally between the two. The sneakers were bought; and payments commenced; but the defendant eventually defaulted on the agreement.

The plaintiff now seeks to have his debt excepted from discharge pursuant to § 523 of the Bankruptcy Code. 11 U.S.C. § 523. He has alleged that the defendant misrepresented his assets, submitted materially false statements, and lied about being married—all in an effort to obtain money from the plaintiff. The defendant admits that certain misrepresentations were made, but argues that they were not material and that the plaintiff never relied upon them. He suggests that the plaintiff was so eager to invest that he actively sought out the defendant, that he failed to make any serious inquiry regarding the defendant's solvency, and that he relied solely on the activity he saw at the defendant's business to make the $5000 purchase.

Finally, the plaintiff alleges that the entire lot of sneakers was sold by the defendant, that the defendant only returned a portion of the proceeds, and that the remaining proceeds were embezzled by the defendant. The defendant counters by saying that only half of the lot of sneakers was sold, that he remitted the proceeds of those that were sold, and that the remaining sneakers were taken when the Worcester County National Bank foreclosed on the business assets of Sneaker Alley.

### FACTS

The defendant, Richard Montbleau ("Montbleau" or "debtor") was the sole shareholder in a shoe store, Sneaker Alley, Inc. ("Sneaker Alley"). Sneaker Alley was Montbleau's second attempt at running a shoe shore. As a result of the failure of the first venture, Montbleau owed his financing bank, Worcester County National Bank, (the "bank"), a total of $30,000 on personal loan guarantees. The bank also held $15,000 in secured notes on Sneaker Alley. In late March of 1978, the bank refused to extend further credit to Montbleau for the purchase of spring and summer inventory.

The plaintiff, Conrad Zammitti ("Zammitti") styled himself as a business man with 40 years experience. In 1978, he was looking for an investment to increase his retirement income. In the process, he stud-

ied the activity at Sneaker Alley for several weeks, liked what he saw, and sought out the owner to talk about a business investment opportunity. Initially, Zammitti sought a partnership investment, but was rebuffed by Montbleau because he did not want a partner, and he was still hopeful that his negotiations with the bank would yield a loan. Both parties, however, kept discussions open for a possible loan-investment by Zammitti because they met each other's needs. Zammitti needed an investment opportunity, and Montbleau needed an alternate source of capital.

During these discussions, in March of 1978, Zammitti did ask Montbleau for the name of his bank. Zammitti called the Worcester County National Bank, and he asked if a check for $1,000 would clear Montbleau's account. This was the only inquiry Zammitti made into Montbleau's credit status. In his testimony, Zammitti indicated that he did not ask for a credit reference from the bank. As a result of his failure to inquire, he did not discover the extent of indebtedness of either Montbleau or Sneaker Alley to the bank. He also did not inquire whether the bank still considered Montbleau creditworthy. Therefore he did not learn that the bank had refused to extend any further credit to Montbleau. Zammitti never asked Montbleau for an inspection of the books, a copy of his tax return, or a profit and loss statement to learn about the financial status of Sneaker Alley.

In early April, 1978, after Montbleau's negotiations with the bank failed, the parties reached an agreement to use Zammitti's funds to purchase inventory for Sneaker Alley. The discussions concerning the agreement were generally held at Sneaker Alley, but on at least one occasion, Montbleau and his current wife went to the Zammitti home to negotiate the agreement. Although Montbleau and his wife were not married at that time, he did introduce her as his wife; he also represented to Zammitti that they jointly owned their residence while in fact, only Montbleau's "wife" owned the home. The plaintiff, however, never checked on the status of the title to the property. Zammitti also never made clear in his testimony what import the ownership of the residence carried with him.

The agreement reached by the parties was reduced to a memorandum and signed on April 3, 1978. It consisted of two major parts: the first was the plaintiff's loan to buy $5000 worth of inventory for Sneaker Alley; the second was a personal guaranty of payment of the loan by the Montbleaus should Sneaker Alley default on payment. Richard Montbleau admitted he forged his wife's signature to this agreement. Attached to this agreement was a ratification by Sneaker Alley, Inc. of its terms. Zammitti also was granted a security interest by Sneaker Alley in inventory to the value of $19,500.

The terms of repayment of the loan called for weekly installments of $400 for 12 weeks and $200 for the thirteenth week to meet the $5000 loan. At the end of the payment period, the parties would have an accounting, and Zammitti was to be paid 50% of the gross profits of the sale of the entire inventory. Montbleau was to pay all expenses of the sale from his share of the profits. To arrange payment, Montbleau gave Zammitti a series of predated checks. Zammitti deposited the checks sequentially. Both parties agree that at least $2400 of checks cleared the bank. Montbleau testified that he thought he paid more than $2400, but he did not have a clear record in his checking account to show this; he also did not keep regular books so he cannot verify the amount by his own records. But, it is clear that by the middle of May, 1978, repayment of the loan had become erratic.

Zammitti, accompanied by Montbleau, purchased $5083.83 of summer inventory for Sneaker Alley directly from the vendors in early April, 1978. The lots were purchased unsorted, and while Montbleau sorted the lots of inventory, he prepared an inventory list which showed how much he paid, what he was to sell them for, and what profit would be generated for the specific items. During April and May, Zammitti checked the inventory from time

to time. During these inspections, he saw changes in the stock on display; he also was told by Montbleau that he was having financial difficulties, and that the bank was talking about foreclosure proceedings in June.

In July of 1978, Zammitti demanded an accounting from Montbleau pursuant to their agreement. Zammitti says the list was presented to him which listed the inventory, its sale price, and the profit of each item, was the final accounting of the total sale of the inventory. He says that there was over $4,000 of profits generated. Montbleau says this piece of paper is a copy of the sorting list he prepared in April, and it does not represent an actual record of the sales. Zammitti's allegation that there are over $2,000 of profits due him which Montbleau appropriated for himself is based on the meaning of this piece of paper. Montbleau says that the stock was not all sold, that in July he still had summer stock available, and that this was only an inventory list. Neither man took a physical count of the inventory on the shelves and stockroom to see what remained of the inventory. Furthermore, Richard Montbleau has testified that he kept no books, and had only a sketchy idea of what was going on in his checking account. This court finds it hard to believe that on this one occasion, Montbleau kept a detailed record of what happened with these items of inventory. Therefore it seems more likely that this paper on which Zammitti bases his allegation of misappropriation or embezzlement is merely an inventory list. Without a physical inventory to establish what had been sold by July, it is difficult to envision what if any profits had been generated. Without a complete sale of the inventory, the profit fund would not exist, and, therefore, there would be no funds to misappropriate or embezzle.

Because, he had not been able to meet the payments according to the agreement between them, Montbleau asked Zammitti in July for an extension of time to make payment on their credit arrangement. An agreement was reached and signed on August 16, 1978. Again Zammitti asked for a personal guarantee from the Montbleau couple, and again Richard Montbleau forged his wife's signature. No payments were made under this extension, and the bank foreclosed on Sneaker Alley in September, 1978.

From the foregoing recitation, it is possible to conclude that Conrad Zammitti and Richard Montbleau struck a deal whereby Zammitti purchased $5,000 of summer inventory for Sneaker Alley, Inc., and Montbleau guaranteed repayment of the indebtedness if Sneaker Alley defaulted. Sneaker Alley, Inc. also granted Zammitti a security interest in the inventory, but no evidence was submitted by Zammitti as to the import of the security interest. The dispute in this case is not over the existence of the debt of Sneaker Alley, Inc., but whether the guaranty of the debt by Montbleau to Zammitti is dischargeable. Zammitti, as the plaintiff, had the burden of showing that the misrepresentation concerning the loan being made to Sneaker Alley and the guarantee and extension agreements were material, and that his reliance on them was so reasonable that the debt should be excepted from discharge in bankruptcy.

## DISCUSSION

The plaintiff in his pleadings brought this adversary claim under 11 U.S.C. § 523(a)(2)(A), (B) and § 523(a)(4). In a claim to except a debt from discharge, the burden of proof in the proceedings is on the holder of the debt. *In the Matter of Taff*, 10 B.R. 101 (Bkrtcy.D.Conn.1981). Mr. Zammitti has failed to meet his burden on any of the allegations.

In his confused and disordered testimony, Zammitti did not establish any embezzlement as required under § 523(a)(4), other than by a bare allegation. There is insufficient proof that any profits existed, and only Zammitti's allegation that Montbleau took them. While the plaintiff's attorney repeatedly sought to establish the factual issues of fraud, Mr. Zammitti in his answers was often unresponsive, and seemed to be more concerned with the establishment of the debt, which Montbleau did not dispute.

Under § 523(a)(2)(B) the plaintiff must demonstrate a writing that is materially false and which represents the debtor's financial condition. Mr. Zammitti has presented in evidence a loan agreement, a guarantee, and an extension of the loan agreement and guarantee, as well as an inventory list. The court is hard pressed to see how any of these documents on their face could be contorted into a financial statement. There are no statements in any document that suggest the financial condition of either Sneaker Alley or Richard Montbleau. Absence of a written statement concerning financial condition is enough to mandate a conclusion that objections under § 523(a)(2)(B) cannot be sustained.

The plaintiff has also raised objection to the discharge of the debt owed to him under the personal guaranties of Richard Montbleau. Montbleau has testified that he forged his wife's signature, misrepresented their marital status, and the ownership of his wife's property. Under § 523(a)(2)(A) Mr. Zammitti had to show that the false pretenses and false misrepresentations or actual fraud were material, and that the creditor reasonably relied on the circumstances and statements.

Zammitti did show that he was primarily interested in a commercial investment in an ongoing business that would yield large dividends in a short period of time. He appeared to use his own observations to look for an investment opportunity. He initially sought out the debtor, and only minimally made inquiries at the debtor's bank concerning the debtor's status. Zammitti did not discover either the $15,000 indebtedness of Sneaker Alley, or the $30,000 indebtedness of Richard Montbleau himself, which were owed to the same bank which handled the Sneaker Alley checking account. The court does not find from the evidence before it that Montbleau's misrepresentation and even the forging of his wife's name were material to Zammitti at the time he made the decision to loan the funds to purchase the inventory.

The standard of proof of fraud under § 523(a)(2)(A) has been the kind involving moral turpitude or intentional wrong. *Matter of Anderson*, 10 B.R. 296 (Bkrtcy.W.D.Wis.1981); *In re Chambers*, 10 B.R. 92 (Bkrtcy.N.D.Ga.1981). The representations must be knowingly and fraudulently made, and they must be relied upon by the other party. *In re Taylor*, 514 F.2d 1370 (9th Cir. 1975). Ultimately, the issue in this case is not whether Montbleau misrepresented some circumstances of the case; but whether Zammitti relied on those misrepresentations. Dischargeability shall not be denied where a creditor's claimed reliance on a statement would be so unreasonable as not to be an actual reliance at all. *Matter of Garman*, 643 F.2d 1252 (7th Cir. 1980).

It was clear from Zammitti's testimony that he was actively seeking an investment opportunity, that he sought out Montbleau to discuss a partnership arrangement in running Sneaker Alley, and that he made the initial overtures to Montbleau based not on any thing said by Montbleau, but based on his own observations of the level of business activity at Sneaker Alley. The only representation that Montbleau made about his solvency according to the testimony of both parties was that he owned a home. Yet, this representation, or more accurately this misrepresentation, by Montbleau did not trigger any questions from Zammitti as to whether the home was an asset free of encumbrances. The pattern of negotiations revealed in the testimony show Zammitti as a man who was determined to make an investment in Sneaker Alley, and incidently, to get a guarantee from Montbleau and his wife. Zammitti expected the repayment of the inventory costs to come from Sneaker Alley, and he expected repayment to be made very rapidly.

Sneaker Alley and Montbleau were strangers to Zammitti. Yet, after only a short observation period, and only a cursory check into the financial status of either Sneaker Alley or Montbleau, Zammitti made a decision to spend his money. The failure to

take even routine precautions to investigate the situation at Sneaker Alley shows how little reliance Zammitti placed on the representations of Montbleau as the principal of Sneaker Alley or as a guarantor. Zammitti did not even ask the bank for a credit reference when he inquired about whether a check would clear Montbleau's account. Nor did he ask to see any financial records of the store. He did not check on whether the residence allegedly owned by Montbleau was available to Montbleau as an unencumbered asset or if in fact it was owned by Montbleau. A review of the testimony of this case shows clearly that the plaintiff relied on his own judgment, experience and observations to make a financial commitment to Sneaker Alley. In this situation, where there have been misrepresentations, and even forgeries of a signature, the plaintiff has not shown that he relied on any statement or guarantee made by Montbleau. Therefore, the plaintiff has not met the burden of proof required by 11 U.S.C. § 523(a)(2)(B)(iii) to permit exception to discharge of the personal loan guarantees made to him by Richard and Joan Montbleau. Therefore, the loan guarantees are dischargeable.