In re Sterling P. DELANO, Debtor.

WHITNEY NATIONAL
BANK, Plaintiff,

v.

Sterling P. DELANO, Defendant.

Bankruptcy No. 84–01246–JG.
Adv. No. A84–0387–JG.

United States Bankruptcy Court,
D. Massachusetts.

June 26, 1985.

Linda M. Grasso, McCabe & Gordon, P.C., Boston, Mass., for defendant.

Thomas B. Bracken, Bracken & Baram, Boston, Mass., for plaintiff.

## MEMORANDUM

HAROLD LAVIEN, Bankruptcy Judge.

This matter came before the Court for trial on the Complaint of the Whitney National Bank against the debtor, Sterling P. Delano ("Delano" or "the debtor"), seeking a determination that a $129,05.82 debt to it owed by the debtor on a guarantee is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) on the ground that the debtor obtained the loan based on his false financial statement. The evidence consisted of documents and the testimony of a bank officer and the debtor. Both parties submitted post-trial memoranda. Based on the documentary evidence and testimony, the Court makes the following findings of fact in accordance with Bankruptcy Rule 7052.

In early 1983 Delano was introduced to the Whitney Bank officer, Monsted, by George Griswold, a long-time customer of the bank and friend of Monsted, who was also a summer acquaintance of Delano, having shopped in Delano's Edgartown leather store. Previously, Griswold had suggested to Delano that in light of the Worlds Fair opening in New Orleans, Delano should establish a similar store in New Orleans. Griswold indicated that he could assemble a group of New Orleans investors, and that Delano would be responsible for operating the business. At a February 1983 meeting at a New Orleans club among Griswold, Delano and the investors, at which Delano was first introduced to Monsted, the parties discussed the bank granting the new business a $100,000 loan. The group explained to Monsted that Delano would be majority stockholder and would run the business, that they would be minority stockholders and invest $65,000. Monsted requested from Delano a personal financial statement because of the Bank's desire for a personal guarantee of the corporate loan.

Delano delivered a personal financial statement to Monsted dated March 31, 1983 sometime in May or early June of 1983. Entitled "Statement of Personal Net Worth, March 31," 1983, the financial statement reflected that Delano's assets had a value of $527,000 and consisted of $33,000 in cash and loans receivable, a $250,000 residence, a $30,000 parcel of land, personal property worth $67,000, marketable securities valued at $19,500, and Delano's interest in Mayhew Lane Leather (his Edgartown store) valued at $127,500. The financial statement listed a total of $155,300 in liabilities, $6900 of which were current bills, and a $148,400 mortgage on his residence. The financial statement listed Delano's net worth as $371,700. Attached to the financial statement was a letter dated April 5, 1983 from Alvan B. Hirshberg, C.P.A., the accountant who prepared the statement, which stated:

A compilation is limited to presenting in the form of financial statements information that is the representation of the owner. I have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or any othe form of assurance on it. You have elected to omit substantially all of the disclosures and the statement of changes in financial position required by generally accepted accounting principles. If the omitted disclosures were included in the financial statement, it might influence the user's conclusions about your financial position. Accordingly, this statement of personal net worth is not designed for those who are not informed about such matters.

From June 1983 through November 1983 the Bank made seven loans to Mayhew Lane Leather Corp., Delano's New Orleans' store, totalling $115,000 all guaranteed by Delano. Monsted did not make an independent credit check of Delano, contact Delano's accountant, or request from Delano any credit references. He did not request that Delano produce any business statements for the Edgartown store. No credit check was performed. The bank officer testified that he reviewed the statement with Delano, however Delano denied such a discussion and testified that he mailed the statement. In light of the accountant's letter and the Bank's receipt stamp of June 6, 1983 I find Delano's the acceptable version.

The Bank previously had never done business with Delano or his corporation. Monsted testified that he decided to grant the loan based on Griswold's reference of Delano, the $65,000 investment by the local group, all of whom were well known to the Bank, being Bank tenants and customers, and because Delano's net worth would support a $100,000 loan since Delano had at least that much equity in his house. Despite this alleged reliance on the equity in the real estate the Bank did not request a mortgage on the house; therefore, the equity was subject to instant dissipation.

In February 1984, at Delano's request, the Bank consolidated the loans into a $115,000 demand note. Monsted, in accordance with his apparent usual practice, mailed the note to Delano in Massachusetts, who signed it as president of the corporation and in his own individual capacity, and returned it to Monsted.

In the spring of 1984, Monsted requested an additional financial statement from Delano because of a bank audit. The Court cannot help but wonder whether anticipation of audits was the real reason for the first request for a financial statement. Delano sent Monsted a new financial statement dated May 23, 1984 which represented his assets to have a value of $298,394, consisting of $2000 in cash, $397 in securities, a $250,000 home, and $46,000 in personal property. There was no listing for the value of his Edgartown or New Orleans businesses. Delano listed liabilities totalling $299,000, including $30,000 unsecured debt to the Edgartown National Bank incurred in February 1984, and $9,000 unsecured obligation to the Edgartown Bank incurred in March 1981, the mortgage on his house of $140,000, and a $120,000 second mortgage to "D. Vauclain." At trial, the debtor testified that Diana Vauclain held a $27,000, not a $120,000 second mortgage, on his residence. In fact, he listed on his schedules the $27,000 mortgage liability to Vauclain as a secured claim. He explained that the $120,000 liability to Vauclain is and was at the time of both financial statements given to the Bank an unsecured debt which was not evidenced by a writing arising out of a series of advances by Vauclain, a friend of Delano from Martha's Vineyard. He admitted that in 1981 he owed Vauclain $100,000 but stated that he forgot to list this debt on the March 1983 financial statement because the debt was not a formal obligation evidenced by a writing. He merely borrowed from Vauclain when he needed money and repaid her when he was able. Delano also testified that he forgot to list the 1981 $9,000 unsecured loan from the Edgartown Bank on his March 1983 financial statement. Delano stated that he neglected to include the

$27,000 mortgage to Vauclain on his March 1983 financial statement because there was no date set for repayment or repayment schedule.

Delano admits that at least $100,000 of the $125,000 liability to Vauclain and the 1981 $9,000 unsecured note to the Edgartown National Bank should have been included in and were omitted from his March, 1983 financial statement to Whitney Bank.

Upon reviewing the new financial statement Monsted became concerned about the increased liabilities, specifically the $125,000 debt listed as owed to Vauclain, the liabilities to the Edgartown Bank, and because the statement omitted any valuation of Delano's businesses. In August 1984 the Whitney Bank sent demand letters for payment of the $115,000 note to Delano.

Delano's Schedule of Liabilities also reflects a $15,000 debt to his accountant Alvan B. Hirshberg incurred in February 1983. This was not listed on the March 1983 financial statement. At trial, Delano testified that at the time of the financial statement this was not actually a debt he owed to Hirshberg, but was an investment by the accountant in Delano's Edgartown business in exchange for a 25% stock interest, which was converted to debt in November 1983.

## DISCUSSION

In order to obtain an exception to discharge, Section 523(a)(2)(B) requires that the creditor prove each of the following elements:

1. That a debt exists as a result of obtaining money or credit;

2. That the money or credit was obtained by a financial statement in writing;

3. That the financial statement is materially false concerning the debtor's financial condition;

4. That the creditor reasonably relied on the financial statement; and

5. That the debtor caused the financial statement to be made or published with the intent to deceive the creditor.

The party seeking the exception to discharge has the burden of proving each and every element required by the statute. *Household Finance Corp. v. Danns*, 558 F.2d 114, 116 (2d Cir.1977); *In Re Coughlin*, 27 B.R. 632, 635 (Bankr.App. 1st Cir.1983). *See* Bankruptcy Rule 4005 (1983). Each element must be shown by clear and convincing evidence. *In Re Coughlin*, 27 B.R. 635, n. 7. The Bankruptcy Code favors discharge; therefore Section 523 will be construed strictly against the creditor's objection and liberally in favor of the debtor. *In Re Whiting*, 10 B.R. 687, 690 (Bankr.E.D.Pa.1981). The Court must examine each of these elements separately to determine whether plaintiff has sustained its burden of proof.

The debtor contends that the corporation rather than Delano personally obtained credit from the Bank. It is well-settled that where the debtor is an officer and shareholder of a corporation and he uses a false financial statement to induce a creditor to extend credit to the corporation, the individual debtor is considered to have obtained money within the meaning of § 523(a)(2)(B). *E.g., In Re Mann*, 40 B.R. 496, 499 (Bankr.D.Mass.1984); *In Re Winfree*, 34 B.R. 879, 883 (Bankr.M.D.Tenn. 1983); *Century First National Bank v. Holwerda*, 29 B.R. 486, 489 (Bankr.M.D. Fla.1983). Accordingly, the Bank has satisfied its burden on the first element of proof.

That the debtor gave a written financial statement is an undisputed fact. The important question is whether the statement was materially false concerning the debtor's financial condition. An incorrect or erroneous financial statement is not necessarily materially false. *L. King, Collier on Bankruptcy*, Par. 523–09, at 523–52 (15th ed. Supp.1982). A materially false statement is one which paints a substantially untruthful picture of financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In Re Biedenharn*, 30 B.R. 342 (Bankr.D.La.1983); *In Re Hunt*, 30 B.R. 425, 440 (M.D.Tenn.1983). *In Re An-*

*derson,* 29 B.R. 184 (Bankr.N.D.Iowa 1983). The question of materiality should be judged not on the basis of the size or seriousness of the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it. *In Re Valley,* 21 B.R. 674 (Bankr.D.Mass.1982). Based upon the testimony and exhibits, I am not convinced that the March 31, 1983 financial statement was "materially false" within the context of Section 523(a)(2)(B). Even accepting the debtor's version of the facts, the March 1983 financial statement omitted approximately $136,000 in liabilities, specifically the Vauclain $100,000 unsecured debt, the Vauclain $27,000 mortgage and the $9,000 loan from Edgartown Bank. These are substantial omissions, but do not crucially change the picture the debtor painted of his financial condition for he would now have a substantial net worth of $235,000.

■ Next, the Bank is required to prove that it actually relied on the financial statement in extending credit and that its reliance was reasonable. *L. King, 3 Collier on Bankruptcy,* ¶ 523.09, at 523–11 (15th ed Supp.1984). In the present case the Bank has failed to show it in fact relied on the financial statement. Instead, I find that the financial statement was merely a formality for the Bank's file. The Bank officer's testimony shows that the most important factor in Monsted's decision to extend credit to the newly formed New Orleans Mayhew Lane Corp. was the introduction and recommendation of Delano to Monsted by George Griswold, a long time bank customer and Monsted's friend. Moreover, a correct financial statement would not have changed the Bank's decision. Monsted's testimony makes clear that its reliance, if any, was on the value of Delano's assets which the Bank officer considered sufficient to support a $100,000 personal guarantee. Had Delano listed the omitted liabilities, his net worth would still have been $235,000, a cushion more than sufficient to support a guarantee of a $100,000 loan to the corporation. In light of the Bank's total failure to attempt any verification of Delano's financial statement,

its admitted reliance on the recommendation by and participation of Monsted's friends and long-time bank customers, and his incidental reliance on Delano's net worth, particularly the substantial equity in his house, and the bank's failure to present evidence that a net worth of $235,000 would have been insufficient for the Bank's purposes, the Court finds that the bank has not demonstrated that the loan would likely have been denied if the lender had received accurate information. As has already been pointed out, if the Bank actually was basing its decision on the value of the house, it would have obtained a mortgage and not have left the liability as unsecured. Had the bank really intended to rely on the equity in the real estate and taken a mortgage the Bank's debt would have been fully protected even with the undisclosed Vauclain $27,000 mortgage because the house, worth $250,000, had only one encumbrance of $148,800 and the land, worth $30,000, was unencumbered.

■ Assuming arguendo that there was a material misrepresentation that would have affected the Bank's judgment, the reasonableness of a lender's reliance must be determined by comparing the Bank's actual conduct with its normal business practice, the standards and customs in the industry, and the particular circumstances of the loan request. *In Re Patch,* 24 B.R. 563 (Bankr.D.Md.1982). The courts have found a lender's reliance on a financial statement unreasonable where: (1) the creditor knows that the financial information is not accurate; (2) the statement contains obviously inadequate financial information; (3) the creditor's investigation of the statement suggests its falsity or incompleteness; and (4) the creditor fails to verify information on the statement. *In Re Price,* 48 B.R. 211, 213 (Bankr.S.D.Fla. 1985). " [R]easonableness requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such state-

ments.'" *National Bank of North America v. Newmark,* 20 B.R. 842, 862 (Bankr. E.D.N.Y.1982) *quoting In Re Magnusson,* 14 B.R. 662, 668–69, n. 1 (Bankr.N.D.N.Y. 1981). "[T]he majority of cases make clear that a lender has a duty to make a reasonable effort to check the credit rating of the debtor and not to rely upon just the financial statement." *Matter of Breen,* 13 B.R. 965, 969 (Bankr.S.D.Ohio 1981). *Accord, Matter of Stout,* 39 B.R. 438, 441 (Bankr. W.D.Mo.1984); *In Re Tashman,* 21 B.R. 738 (Bankr.D.Vt.1982); *In Re West,* 21 B.R. 872 (Bankr.D.Mass.1980); *In Re Montbleau,* 13 B.R. 49 (Bankr.D.Mass.1981). Reliance has been found unreasonable where the financial statement discloses facts that would put a reasonable creditor on notice that it should make further inquiry. *In Re Biedenharn,* 30 B.R. 342, 345 (Bankr.W.D.La.1983); *Matter of Granovetter,* 29 B.R. 631, 640 (Bankr.E.D.N.Y.1983).

 In the present case, the Bank officer's testimony shows that even if the Bank did in fact rely on the financial statement it was not reasonable in its reliance. The bank officer failed to conduct even a simple credit investigation of Delano or his Massachusetts corporation when the Bank had no previous dealings with them and had no knowledge of Delano's business abilities. The loan officer did not even request credit references from Delano such as from business suppliers or his mortgagee. More importantly, the Bank ignored the "red flag" of the financial statement— the accountant's explanatory letter disclosing that omissions in the financial statement might affect the user's conclusions. Monsted did not even call or write to the accountant, when he had his address and telephone number, to discuss the financial statement. Monsted admitted that he simply accepted the financial statement and representations by Delano, whom he had only met once. The Bank was negligent in failing to obtain supporting documentation for the financial statement and in failing to conduct an independent investigation. Operating under the assumption that the financial statement was materially false, its choice to rely on Delano's financial statement cannot be considered reasonable.

 Finally in order to find the false statement is grounds for determining the debt to be non-dischargeable it must be determined whether the debtor intended to deceive the Bank. Where a debtor knew or should have known of errors in a financial statement and he fails to correct the error, it may be inferred that he intended to deceive the lender. *In Re Coughlin,* 27 B.R. 632, 636 (Bankr. 1st Cir.1983). Courts have found the requisite intent to deceive where a debtor does not disclose a liability knowing that, if disclosed, the lender would not extend credit. *See In Re Denenberg,* 37 B.R. 267 (Bankr.D.Mass.1983). In the present case, the plaintiff Bank has not sustained its burden of proving this element. That the debtor's failure to list the substantial Vauclain liabilities was due to inadvertence, is credible under the circumstances of this case, although, at first blush, difficult to believe. The indebtedness was not a typical liability because there was no promissory note, interest was not charged, and there was no regular monthly payment schedule. Moreover, there was no logical reason in Delano's mind to believe that inclusion of the liabilities would cause the Bank to deny the loan. First, as far as Delano was concerned, the loan was extended because of the Bank's relationship with Griswold. Secondly, since the loan officer admitted he partially based his decision on Delano's net worth, but provided no formula to indicate that a net worth of almost two and one half times would not be adequate. Delano had no reason to believe that the loan still would have been extended if the actual liabilities were disclosed because his net worth would still have been sufficient to support a $100,-000 loan. Therefore, the debtor had no reason to willfully misrepresent his financial condition or to expect that the loan would be denied if the additional debts were included in the financial statement.

The Bank has failed to sustain its burden of proof on the elements of material misrepresentation that would affect the deci-

619

sion to grant credit, reliance and intent to deceive. Judgment shall enter for the defendant in this adversary proceeding.