In re Joseph W. SULLIVAN, Debtor.

**PACIFIC INTERNATIONAL DEVELOPERS CORPORATION, LTD. and Carl F. Finseth, Plaintiffs,**

v.

**Joseph W. SULLIVAN, Defendant.**

Bankruptcy No. 85–651–HL.

Adv. No. A85–0354.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 4, 1986.

Alan B. Rubenstein, Rackemann, Sawyer & Brewster, Boston, Mass., for plaintiffs.

Jerome E. Rosen, Lappin, Rosen & Goldberg, Boston, Mass., for defendant.

## MEMORANDUM DENYING DISCHARGEABILITY

HAROLD LAVIEN, Chief Judge.

The plaintiffs, Pacific International Developers Corporation, Ltd. (heretofore referred to as "PIDC") and Carl Finseth, brought this adversary proceeding against the debtor/defendant, Joseph Sullivan, seeking a judgment of nondischargeability pursuant to 11 U.S.C.A. § 523(a)(2)(A) and (B).[1] The plaintiffs allege that the debtor intentionally misrepresented himself to have an individual net worth of approximately $1,878,720 when, in fact, it was unlikely that he had as much as $100,000, to be a member of the William Sullivan, Jr. family (well known for its ownership of the Patriots football team as well as other large financial holdings), to be a licensed Certified Public Accountant in the State of Massachusetts, as well as numerous other false representations. These representa-

---

1. § 523. Exceptions to Discharge

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

tions were both oral and written in the form of a resume and financial statement submitted by Sullivan to PIDC. The plaintiff, PIDC, is a Hawaii Corporation wholly owned subsidiary of Pacific International, Inc., a Nevada Corporation wholly owned by Carl Finseth and his family. Joseph Sullivan is an individual debtor in bankruptcy.

In September of 1982, PIDC and Carl Finseth, as its president, owned and operated a restaurant in Hawaii, named "The Koko Marina Wharf". The restaurant was located in a shopping center leased by Prudential Insurance Co. ("Prudential") in which PIDC subleased its premises and Carl Finseth guaranteed its obligations. Joseph Sullivan frequented the restaurant during September and October of 1982 and formed a social relationship with the staff and management. By the end of October, Joseph Sullivan approached Carl Finseth with an offer to purchase the restaurant, which was not formerly on the market for sale; however, Mr. Finseth was not adverse to the proposal. Mr. Finseth, initially, set the price for the restaurant at one times gross, which he represented to be $1,700,000. As negotiations proceeded, the parties agreed on a price of $1,100,000.

When Sullivan first approached Finseth about purchasing the restaurant, he stated that he was seeking investments for his family which was the Sullivan Family of Boston Patriots fame. As negotiations moved forward, he told Finseth that his thinking as regarded including his family in the business had changed and he was now interested in establishing himself independent of them. Furthermore, Sullivan requested that Finseth not contact William Sullivan even to check as a reference. He stated that William Sullivan would, purposely, destroy the deal for him if he knew he were doing it independently of his family. Finseth stated he found this request understandable and did not become suspicious. With the intent of purchasing the restaurant, Sullivan formed Koko Head

Restaurant, Inc. ("Koko Head"), a Hawaii corporation, funded with $1,000 of capital.

The Purchase and Sale Agreement was signed on November 3, 1982. As part of the agreement, PIDC took back a note and a purchase money mortgage of $731,673.25 from the corporation on the furniture, fixtures and sublease which Sullivan, personally, guaranteed. Sullivan agreed to indemnify Finseth for any losses he may suffer to Prudential resulting from any breach of the sublease by Koko Head. The agreement contained as a condition to closing, the requirement that Sullivan would deliver a copy of his financial statement to PIDC within seven days and it would have to be approved prior to closing. Finseth wanted to be sure that if three-quarters of the purchase price was to be represented by paper, he was dealing with someone substantial, especially since the Sullivan Family was no longer to be involved in the purchase. Therefore, the agreement expressly provided an option in the seller to cancel the deal if the financial statement did not show a substantial equity. The agreement also explicitly stated that Sullivan represented his net worth to be in excess of $1,800,000 and that so long as any monies should be due PIDC under the promissory note, he was to maintain a minimum net worth of $1,100,000 plus. On November 3, 1982, Sullivan delivered to Finseth a copy of his financial statement, and Finseth forwarded a copy to Prudential in order to receive their consent for the subleasing to Koko Head on which the entire deal was dependent.

Prior to closing, Finseth and an Associate met with Sullivan in order to clarify some questions Finseth had about the financial statement. The statement was printed on paper with the letterhead[2] Joseph W. Sullivan, C.P.A. in the top center, a Sharon, Massachusetts address on the left side of the page, and a Massachusetts phone number on the right side. As one of the many assets on the statement, Sullivan listed a 50% interest in this Massachusetts accounting firm which he valued at $75,-

2. There was testimony that this stationery was    specially printed in Hawaii.

000. Of course, the implication of the letterhead and listing of the accounting firm is that Sullivan was a CPA in Massachusetts. The other equally imaginative assets which Sullivan represented to own are substantially all of the items shown on the financial statement.

21 Walpole Street
Sharon, MA. 02067

(617) 784-6308

Joseph W. Sullivan, C.P.A.

BALANCE SHEET
Joseph W. Sullivan
October 31, 1982

ASSETS

CURRENT

| | |
|---|---:|
| Cash on Hand | $ 14,525 |
| Cash in Banks—Bank of Hawaii & Hon. Fed. | 20,520 |
| Notes Receivable—Business | 125,000 |
| Notes Receivable—Personal | 55,000 |
| Marketable Securities (Market Value 9/30/82) | 44,000 |
| Other Securities (Estimated Value 9/30/82) | 56,000 |
| Precious Metals (Market Value 9/30/82) | 47,500 |
| Precious Metal Options (Cost) | 12,100 |
| Coin Collection (Appraised 6/30/82) | 90,450 |
| **TOTAL CURRENT ASSETS** | **$ 465,095** |

OTHER

| | |
|---|---:|
| Sullivan Family Trust—5% Interest (9/30/82) | $ 326,250 |
| Sullivan Enterprises—75% Interest (9/30/82) | 480,500 |
| Joseph W. Sullivan, C.P.A. Firm—50% Interest | 75,000 |
| Cash Surrender Value Life Insurance | 22,750 |
| **TOTAL OTHER ASSETS** | **$ 904,500** |

FIXED:

| | |
|---|---:|
| Real Estate—USA (Appraised 6/30/82)—Mass. | $ 215,500 |
| Real Estate—Bahamas (Appraised 6/30/82) Berry Island | 120,250 |
| Undeveloped Land—USA (Appraised 6/30/82) Mass. & Vermont | 115,000 |
| Undeveloped Land—Bahamas (Appraised 6/30/82) Berry Island | 45,000 |
| Undeveloped Land—Nova Scotia—Middleton (Appraised 6/30/82) | 35,000 |
| Automobiles—Personal—Monte Carlo | 8,500 |
| Automobiles—Sports—Corvette & MG | 32,500 |
| **TOTAL FIXED ASSETS** | **$ 571,750** |
| **TOTAL ASSETS:** | **$1,941,345** |

LIABILITIES

CURRENT:

| | | |
|---|---:|---:|
| Mortgage Payable—USA | $ 4,500 | |
| Loan Payable—Auto | 2,750 | $ 7,250 |

## LIABILITIES

**LONG TERM:**

| | | | |
|---|---|---|---|
| Mortgage Payable—USA | | $ 51,250 | |
| Loan Payable—Auto | | 4,125 | $ 55,375 |
| | | **TOTAL LIABILITIES** | **$ 62,625** |

### NET WORTH

| | |
|---|---|
| Surplus | $1,878,720 |
| **TOTAL LIABILITIES AND NET WORTH** | **$1,941,345** |

Contingent Liability: Guarantor of Personal Note In The Amount of $25,000

Each and every asset entry was false or misleading and Sullivan, himself, conducted all of the alleged appraisals. When Sullivan was asked at his deposition to explain the value he assigned each asset on his financial statement, after it became evident that he either did not own the asset or that its value was inflated out of all relation to reality, he stated, the numbers were calculated under a system of "creative accounting" and were projections of possible future value or profits.

The cash on hand and in banks of some $35,045 did not exist. None of the banks listed in Sullivan's deposition had funds on October 31, 1982 except for $1,243.75 in the Bank of Hawaii.

Sullivan could not produce any of the notes or stock certificates to back up the $180,000 in notes or the $100,000 in securities, claiming that they were either stolen from his car in Hawaii or thrown out by his wife, who was in the midst of a divorce proceeding with him. The persons who allegedly signed the notes denied having signed any notes or that they ever owed Sullivan any debts and, in any event, the alleged business debts were from then insolvent corporations and would have been uncollectable.

As to the stock, the stockbroker who was listed in the deposition, namely, Merrill, Lynch, had an account that had a market value as of October 1982 of only $1,920.

The precious metals valued at $47,500 were purchased on margin and the amount listed was the margin cost and, like the options listed at $12,100, were lost. In any event, this listing should have been offset by the liabilities involved.

It was revealed by Sullivan at the deposition that he no longer had the coins, which he sold at much less than their alleged $90,450 value, and had no list of them from which their value as of October 31, 1982 could be verified.

Originally, he told Finseth that the trust and enterprises were part of the Sullivan Family empire. Later, at his deposition, Sullivan explained that the $326,250 value of the Sullivan Family Trust was the total value of the Trust, and that his 5% interest was worth some $16,000. In fact, the Sullivan Family Trust was not really a Trust at all but actually, Sullivan alleged at deposition custodial accounts set up by him for his children. Furthermore, Sullivan assigned himself the 5% interest by an agreement which he wrote but no longer had a copy of. A check with the banks supposedly holding the custodial accounts, disclosed that none of the banks had ever had any such accounts.

Another example of Sullivan's blatant misrepresentation is the listing of the Sullivan Enterprises of a 75% interest for $480,500. First of all, Sullivan conceded in his deposition, that the value listed was for 100% ownership, not the 75% interest he controlled. Further, the amount itself was not calculated on any real assets, but through "creative accounting" as a projection of possible future profits of such things as condominiums which he did not actually own.

At the deposition, Sullivan stated that he did not know the face value of any of the life insurance policies but it appeared through other evidence that there were two policies worth a total of $11,000.

Sullivan did not own the property listed under real estate—USA—$215,000 and Undeveloped Land—USA—$115,000. This land belonged to his stepfather and was a house and the six (6) acres of land surrounding the house, which were valued by a real estate agent at $85,000 and, in a rising market, both the land and the house were sold in 1984 for a total of $80,000. Again, the real estate in the Bahamas was a single condominium and the undeveloped land surrounding it, which were listed separately for a total of $165,250. Both were sold in early 1983 for a total of $80,000. The land in Nova Scotia was not owned by the debtor but, rather, was owned by his brother.

As to the automobiles, the personal automobile was sold in 1984 for $7,500 and the automobiles—sport, valued at $32,500, were a 1957 Thunderbird and a 1964 Corvette.

Koko Head never made any payments under the promissory note that Finseth took back. Within a short time, the restaurant was in Chapter 7 proceedings. No money was paid under the sub-lease to Prudential, as a result of which, a suit was commenced by Prudential against Koko Head, Sullivan, PIDC, Finseth, and others. PIDC and Finseth filed cross-claims against Sullivan in this same action claiming damages resulting from Sullivan's default under the promissory note as well as under the sublease. On May 9, 1984, judgment was entered on the cross-claims in favor of PIDC and Finseth against Koko Head and Joseph Sullivan, jointly and severally, in the amount of $858,252.68, plus interest. It is expected that little, if any, money will be realized on the state court judgment from the assets of the Koko Head bankruptcy estate.

A day-and-a-half trial was held in this adversary proceeding, at which two witnesses from Hawaii testified. Joseph Sullivan did not appear in court to testify, however, his deposition was read into the record. On the second day of trial, his attorney represented that Sullivan had suffered a mild heart attack and, as a result,

would not be able to appear during the trial, but counsel did not ask for a continuance. Patrick Sullivan, son of William Sullivan, testified that Joseph Sullivan was not related to his family and that he did not now or at any time have any connection with the Patriots or any other Sullivan Family business interests.

Finseth testified, and I so find, that he would not have sold the restaurant if he had known of Mr. Sullivan's true net worth and background. The debtor counters that Finseth did not rely on the financial statement but rather on the security interest he took on the personal property and sublease and even if he did rely, his reliance was unreasonable because of his failure to verify the financial statement. Counsel cites as authority an earlier decision of this Court. *In re Delano*, 50 B.R. 613 (Bankr. D.Mass.1985).

There was no evidence offered as to any residual value in the security and while it may well have been of some value at the time of the sale and, therefore, one of the seller's considerations, it was not the sole or major consideration. Reliance on a false financial statement need not be the exclusive consideration so long as it was a substantial consideration in causing the seller to enter into this transaction. In *In re Coughlin*, 27 B.R. 632 at 637 (Bankr. App. 1st Cir.1983):

> All that is required is that the financial statement was a "contributory cause of the extension of credit." *American Bank & Trust v. Drewett (In re Drewett)*, 13 B.R. 877, 880 (Bankr.E.D.P.A. 1981) (quoting *State Employees Credit Union of Md., Inc. v. Shipley, (In re Shipley)*, 1 B.R. 85, 90 (Bankr.D.Md. 1979)).

In the case at hand, I find that both of the parties were aware of the reliance being placed on the financial statement as evidenced by the express conditions for terminating the Purchase and Sale agreement that surrounded the financial statement and the net worth requirements.

698

■ As to reasonable reliance and investigation, clearly, Finseth's actions left much to be desired, however, his action or inaction must be viewed in context. Sullivan was glib. He held himself out as an early participant in setting up the family Patriot franchise and a close member of that Sullivan Family for whom he was originally scouting the deal. When questioned about his original submission of a financial statement, he filled in the details by associating some of his major assets with that Sullivan Family to which he claimed membership. He gave himself and his numbers a ring of authenticity by having stationery printed in Hawaii, describing himself as a C.P.A. in Massachusetts. While these deliberate false statements of family membership and being a licensed C.P.A. are not enough to deny dischargeability under Section 523(a)(2)(A) since they, by themselves, would not have resulted in the extension of the credit sale, they are an important part of the scheme to cause Finseth to accept the financial statement based on Sullivan's credibility. The statement was provided to Prudential Insurance Company for approval and, with all their assumed financial acumen, they approved the financial statement. Then, there were the references and the credit report. All but one of the eight references, were contacted without any derogatory information being disclosed. In addition, Finseth asked a personal friend, who was an attorney in Honolulu and grew up in Boston, about Sullivan, who stated that he understood Joseph Sullivan to be part of the William Sullivan Family. Finseth contacted some officers at the Bank of Hawaii who stated that Sullivan was in the process of finalizing some loans with the bank and had received a very good credit rating from them. Finseth also ordered a credit report which simply stated that Sullivan had some small bank accounts in Hawaii, and did not disclose anything derogatory. Finseth sent this statement to Prudential. Several of the attorneys working at the law firm representing Finseth in the sale had gone to school in Boston and nothing of a derogatory nature was learned from inquiring of them. Under all of the circumstances, it was not unreasonable for Finseth not to check to see if any of the assets really existed. Finseth, without the benefit of hindsight, approved the financial statement after Prudential approved it for purposes of the sub-lease.

Under all of the circumstances, Finseth's reliance without further checking was reasonable.

I find and rule that the debtor obtained the restaurant by use of a materially false financial statement, which he caused to be made on false letterhead with the deliberate intent to deceive the plaintiffs, and they reasonably relied on that materially false financial statement in selling this restaurant and taking back purchase money paper. They would not have entered into the transaction but for the deliberate and willful false financial statement and, therefore, the judgment recovered on the note given for the balance of the purchase price is not dischargeable under 11 U.S.C. § 523(a)(2)(B).

■ The debtor's reliance on a recent decision of this Court is misplaced. This case is distinguishable from *Delano*, 50 B.R. 613 (Bankr.D.Mass.1985), in which this Court did not find reliance by the plaintiff and discussed the lack of analysis and investigation of the financial statement. In *Delano*, the plaintiff/bank did not rely on the defendant's financial statement in determining whether to lend him money. Rather, the bank relied on the defendant's association with substantial and long term bank customers. While not a controlling fact, the Court gives some weight to the higher standard of care expected from a bank which regularly deals in this type of transaction.

As stated in *Delano*, at 618:

The reasonableness of a lender's reliance must be determined by comparing the Bank's actual conduct with its normal business practice, the standards and customs in the industry, and the particular circumstances of the loan request, *In re Patch*, 24 B.R. 563 (D.C.D.Md.1982).

Reasonableness is to be judged from the reasonably prudent man standard. *See, National Bank of North America v. Newmark,* 20 B.R. 842, 862 (Bankr.E.D.N.Y. 1982), *In re Magnusson,* 14 B.R. 662, 668–69, n. 1 (Bankr.N.D.N.Y.1981).

Prudential, which received the same financial statement, also found that Sullivan had provided them a credible financial statement. It is not clear what checking, if any, Prudential did, and that is really not our present concern. What is our concern is the reasonableness of the principals assuming Prudential had a much greater sophistication than themselves in financial matters and therefore relying, to some extent, on its judgment. The principals could reasonably have relied on the facts set forth in the financial statement as being close to the truth, having made their own character checks and having been informed that Prudential was satisfied and, therefore, willing to accept Sullivan on the sublease. The principals certainly had no reason to believe that the financial statement was so far inflated that far from representing $1,800,000 in net worth, they probably were lucky if it represented as much as $100,000 in net worth.

In deciding whether the plaintiff has carried its burden of proof, the Court will consider the basic premise within the Bankruptcy Code favoring discharge. As pointed out in *In re Morris,* 4 *Colliers on Bankruptcy,* § 332 (15th Ed.1981), the exemptions to dischargeability are antithetical to the basic philosophy behind the Code which is to give the debtor a fresh start. This Court stated in *In re Delano,* at 617, "Section 523 will be construed strictly against the creditor's objection and liberally in favor of the debtor." The plaintiff has a very heavy burden to carry for he not only has to prove that the defendant intentionally misrepresented himself, but that his own behavior was reasonable in relying on the defendant's false representations.

The defendant argues that the plaintiffs' reliance was not what a reasonably prudent man would have done and that the principals were anxious to sell the restaurant.

The defendant's argument was very well characterized by the Court in *In re Esposito,* 44 B.R. 817, 824 (Bankr.S.D.N.Y.1984):

> [The debtor] seems to argue, as confidence men invariably do, that the real perpetrator of this crime is the victim, for allowing himself to be victimized in the first place. Given his elaborate scheme, accomplished by guise, false documentation and trick, this *in pari delicto* argument falls flat.

We seldom see facts so clearly indicating a deliberate intent to deceive. There is no question in the Court's mind that Sullivan knew the financial statement he prepared on the specially fabricated letterhead was not a realistic portrayal of his finances, that he was not a CPA in Massachusetts and, clearly, that he was not connected in any way with the Patriot Sullivans. Even by the standards of "creative accounting", Sullivan's conduct evidenced a deliberate scheme to cause the plaintiffs to rely, to their detriment, on his material misrepresentation.

■ The debtor claims that the plaintiffs may have setoffs as a result of the Hawaii bankruptcy or litigation. As in any judgment, the question as to how it will be enforced is a matter for the Court that has issued it. To the extent that there are setoffs or offsets, that is a matter to be handled in the collection procedures. To the extent that there may be any argument that there may be offsets against this judgment, they should be presented in the state court, and that's where those matters will be resolved. *See, In re George Henry,* 52 B.R. 8, 13 B.C.D. 388 (Bankr.S.D.Ohio 1985). This Court stops with the determination that judgment on the notes is nondischargeable.