In re Stanton L. GREENE, dba Innovative Products, Inc., Debtor.

FIRST INTERSTATE BANK OF NEVADA, Appellant,

v.

Stanton L. GREENE, dba Innovative Products, Inc., Appellee.

BAP No. NV–88–1078.
Bankruptcy No. 85–1076.
Adv. No. 86–0024.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 17, 1988.

Decided Feb. 10, 1989.

Cheryl A. Skigin, Wiener, Waldman, Gordon & Silver, Ltd., Reno, Nev., for appellant.

Charles F. Wong, San Francisco, Cal., for appellee.

Before RUSSELL, PERRIS and VOLINN, Bankruptcy Judges.

## OPINION

RUSSELL, Bankruptcy Judge:

This appeal arises from the bankruptcy court's finding that the debtor's financial statement, which omitted a secured claim of approximately $100,000, was not a materially false statement in the context of the requirements of section 523(a)(2)(B) of the Bankruptcy Code and that the debt was not excepted from discharge. WE REVERSE.

## FACTS

STANTON L. GREENE (debtor) approached FIRST INTERSTATE BANK OF NEVADA ("FIB") (appellant) in March of 1984 seeking a loan of $10,000 ("FIB Loan") to finance a new business venture. The loan eventually was granted on March 26, 1984.

At the time FIB granted the $10,000 unsecured loan, the debtor was obligated to Nevada First Thrift ("NFT") for $91,659.64 ("NFT Loan"). The NFT Obligation consisted of two loans, each in the amount of $45,829.82, and was secured by a second deed of trust on the debtor's residence. It was obtained on March 26, 1981 and it matured on March 26, 1984, the exact date the debtor obtained the unsecured FIB Loan. FIB claims it had no knowledge of the NFT Loan and that it would not have granted its loan if it had been informed of the NFT Loan.

The debtor had enjoyed a positive relationship with FIB for a number of years prior to the procurement of the FIB Loan. He was the Vice–President of the Old Town Mall Shopping Center, located in Reno, Nevada, until 1981, and he conducted his banking at the FIB branch located in the mall. During those years, he also enjoyed a close relationship with FIB's two branch managers and he encouraged shopping mall tenants to bank at this branch. He often had lunch and coffee breaks with these branch managers and he discussed his business affairs with them. It is unclear, however, whether there was any discussion, or if the branch managers knew, of the existence of the NFT Loan.

The debtor had obtained several small loans from FIB since 1978 and each loan had been promptly repaid. Because of the relationships between the debtor and the branch managers, the strict loan procedures usually followed for loan processing

became relaxed. The debtor testified that one loan was even approved on the telephone in advance of any financial statements being signed by him. However, throughout the course of their relationship, FIB maintained financial records through a series of financial statements from the debtor which were supposed to accurately reflect his financial condition at the time he prepared them. The record indicates that there was no financial statement available for 1981, the year the debtor obtained the NFT Loan. The financial statements for the years 1982, 1983 and 1984 did exist, but none reflected the NFT Loan.

The sole area of factual controversy involves the execution of the 1984 financial statement and the actual granting of the FIB Loan. On March 26, 1984, the debtor executed a note to FIB for $10,000. On March 30, 1984, four days later, the debtor executed a new financial statement which reflected no substantial changes since the prior March 10, 1983 statement.

At the trial on FIB's section 523(a)(2)(B) complaint, the debtor claimed that he never executed a prepared financial statement for 1984. Rather, he contended that the financial statement was executed in blank and that FIB subsequently added the indicated information. However, he had no other memory regarding any of the details of the transaction which resulted in his receipt of the $10,000 FIB Loan.

FIB claimed that the financial statement was not executed in blank. Both William Nelson, the branch manager, and Judy Smith, his secretary at the time of the FIB Loan, testified that they had never, in the course of their positions at FIB, received a financial statement signed in blank on which the applicant's information was subsequently added.

Mr. Nelson testified that he recalled meeting with the debtor and reviewing his 1983 financial statement to determine if there had been any significant changes in the debtor's financial condition. He recalled that they analyzed the prior financial

statement and wrote the changes for 1984 over that statement. The debtor reviewed those changes and a rough draft of a new financial statement for 1984 was prepared in the debtor's presence. No credit check of the debtor was required since he was a continuing customer with a good credit record.

A typed statement for 1984, evidencing the draft, was executed on March 30, 1984, four days after the FIB Loan was approved. However, the NFT Loan was not indicated in the draft or the executed version of the 1984 financial statement, nor was it included in any prior financial statements.

Mr. Nelson also testified as to the decision making process he used in granting the FIB Loan to the debtor. Originally, he denied the debtor's application because the funds were to be used to finance a new business venture. He only reconsidered the application upon the debtor's insistence.

FIB's loan procedures required both a primary and secondary source of repayment of the FIB Loan. Mr. Nelson considered the new business venture to be the primary source. It involved a window cleaning product and a product to remove grease stains from concrete. The existence of apparent substantial equity in the debtor's residence was determined to be the secondary source of repayment. The substantial equity was based on the fact that the debtor listed the value of his residence at $375,000 on his financial statements for 1983 and 1984, but only listed a lien on the property of $69,000. The NFT Loan of approximately $100,000 was not indicated on these statements. After reviewing the debtor's financial statement and relying upon the apparent substantial equity in the debtor's home, Mr. Nelson agreed to grant the debtor the $10,000 loan.[1]

The FIB Loan was renewed twice, on July 9, 1984 and on October 9, 1984, in continued reliance of the debtor's financial statements. The debtor subsequently was unable to pay the loan or reduce the princi-

---

1.  The FIB Loan was not secured by the debtor's residence or any other property. Nonetheless, Mr. Nelson claimed that he would have denied the loan request if he had known of NFT's second mortgage and its effect on the debtor's equity in his residence.

pal balance on the final maturity date of February 1, 1985. Thereafter, On May 21, 1985, FIB exercised its right of setoff and reduced the principal to its current balance of $7,218.97 (plus interest). No further payments were made.

The debtor filed his Chapter 7 petition on December 3, 1985. His schedules, filed on December 4, 1985, reflected a debt in favor of NFT of $120,794.24, secured by a second deed of trust on his home. FIB was listed on the same schedules with an unsecured obligation owing of $7,802.83. After reviewing the debtor's schedules and questioning the debtor at the section 341 meeting of creditors regarding the existence of this NFT obligation, FIB filed a complaint objecting to dischargeability pursuant to section 523(a)(2)(B) of the Bankruptcy Code on February 20, 1986.

The matter was tried on November 19, 1987. In its Memorandum Decision determining the debt to be dischargeable, the bankruptcy court found that the omission of the secured debt of approximately $100,-000 from the debtor's financial statement was not a material omission which would give rise to a claim of nondischargeability.

FIB timely filed this appeal and submitted its briefs in support thereof. The debtor chose not to file an appellee's brief.

## ISSUE

Whether the bankruptcy court erred in finding that the financial statement executed by the debtor on March 30, 1984 to procure the FIB Loan was not materially false, even though it omitted the secured obligation to Nevada First Thrift.

## STANDARD OF REVIEW

A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard and its conclusions of law are reviewed *de novo*. *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1469 (9th Cir.1988); Bankruptcy Rule 8013. "A finding is clear-

ly erroneous if, after a review of the record, the appellate panel is left with a firm and definite conviction that error has been committed." *In re Burkhart*, 84 B.R. 658, 660 (9th Cir. BAP 1988).

## APPLICABLE STATUTE

Section 523(a)(2)(B) of the Bankruptcy Code is the statute applicable for this appeal. It states that

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B).

## DISCUSSION

In order for a court to find a debt for obtaining money nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code, the following factors must be established: (1) the existence of a statement in writing; (2) the writing must be materially false; (3) it must concern the debtor's financial condition; (4) the creditor must have reasonably relied on the statement; and (5) the statement must be made or published with the intent to deceive. *Regency Nat'l Bank v. Blatz*, 67 B.R. 88, 90 (E.D.Wis.1986); *In re Furimsky*, 40 B.R. 350, 353 (Bankr.D.Az.1984). *See In re Lansford*, 822 F.2d 902, 904 (9th Cir.1987).[2]

Numerous courts have considered and attempted to determine the meaning of the

---

**2.** The parties agree that there existed a statement in writing concerning the debtor's financial condition. The focus of our analysis is whether a material misrepresentation occurred. If such did not take place, then we need not discuss whether there was reasonable reliance by FIB or whether the debtor published the financial statement with an intent to deceive because these issues were not addressed by the bankruptcy court.

terminology "materially false." Although no precise definition exists, it is clear that it is not sufficient simply to show that the statement is factually incorrect. "An incorrect or erroneous financial statement is not necessarily materially false." *In re Denenberg,* 37 B.R. 267, 271 (Bankr.D. Mass.1983). Rather, courts have found a materially false statement to be one which "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally effect the decision to grant credit." *In re Nance,* 70 B.R. 318, 321 (Bankr.N.D. Tex.1987), quoting *Denenberg,* 37 B.R. at 271. *See In re Delano,* 50 B.R. 613, 617 (Bankr.D.Mass.1985).

■ "Material falsity" in a financial statement can be premised upon the inclusion of false information or upon the omission of information about a debtor's financial condition. *In re Anzman,* 73 B.R. 156, 163 (Bankr.D.Colo.1986). *See In re Howard,* 73 B.R. 694, 703 (Bankr.N.D.Ind. 1987). Courts have held that the omission, concealment or understatement of material liabilities can constitute a materially false statement and may lead to nondischargeability of the debt. *Howard,* 73 B.R. at 703; *In re Harmer,* 61 B.R. 1, 5 (Bankr.D. Utah 1984).

■ A statement can be materially false if it includes information which is "substantially inaccurate" and is of the type that would affect the creditor's decision making process. *Howard,* 73 B.R. at 702; *In re Iverson,* 66 B.R. 219, 224 (Bankr.D.Utah 1986); *In re Hunt,* 30 B.R. 425, 440 (Bankr.M.D.Tenn.1983). To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain "important and substantial untruths." *In re Roland,* 65 B.R. 1003, 1006 (Bankr.D.Conn. 1986).

Due to the smallness of the FIB Loan in relation to the debtor's net worth, the bankruptcy court invited briefs from the parties on whether it was enough that the financial statement was false or whether the word "materially" had legal significance. Neither party filed such a brief.

The court therefore rendered its decision by comparing the debtor's net worth with the amount of the FIB Loan. The debtor's financial statements indicated that he had a net worth of $273,000 in 1978, $498,000 in 1980, $745,000 in 1982, $559,000 in 1983, and $584,000 in 1984.

The bankruptcy court held that the omission of the $100,000 NFT Loan from the debtor's financial statements was not a material misrepresentation. The court stated that the loan of $10,000 was miniscule when compared with the debtor's net worth. Specifically, the court stated that "the result of the omission of the second deed of trust on Greene's home was to reduce the net worth of Greene from 58 times the sum loaned to 47 times. The court does not view this a significant distortion of financial condition. . . ." In light of these facts, as well as the policy of giving an honest debtor a fresh start [*See In re Cross,* 666 F.2d 873, 879 (5th Cir. 1982); *In re Posick,* 26 B.R. 499, 501 (Bankr.S.D.Fla.1983)], the court held that the debt to FIB was dischargeable.

■ This determination that there was not a material misrepresentation is clearly erroneous. Although some cases have held that when the debtor's net worth remains substantial after correcting for substantial omissions on financial statements the misrepresentation is not material (*See Roland,* 65 B.R. at 1006–07; *see also Delano,* 50 B.R. at 618), we nevertheless find that this debtor's omission of the $100,000 NFT Loan from several of his financial statements did constitute a material misrepresentation.

The debtor's 1983 and 1984 financial statements show total debts of $159,000 as of February, 1983 and $138,000 as of March, 1984. The largest debt listed on both statements was the $69,000 First Trust Deed on the debtor's residence. The omitted $100,000 NFT Loan was approximately 30 per cent higher than any other debt indicated on the statements and constituted approximately 40 per cent of the debtor's total debt. The omission of a debt of such magnitude in relation to the total

debt structure is a clear example of a material misrepresentation.

The picture painted by the debtor in his financial statements was one of relatively little debt in relation to his assets. It suggested financial stability. However, the record indicates that the debtor on numerous occasions had been in default on the $100,000 NFT Loan. That loan, which matured on the date the debtor obtained the FIB Loan, was rewritten at a later date. The debtor eventually defaulted on the rewritten note and NFT foreclosed on the debtor's residence.

Mr. Nelson indicated that FIB relied upon the debtor's equity in his home as a secondary source of repayment of the FIB Loan. The omission of the NFT Loan from the debtor's financial statements resulted in a substantial overstatement of the debtor's equity in the property. Such an omission distorted and materially misrepresented the debtor's overall financial picture and may have drastically affected the lender's judgment in granting the FIB Loan. Mr. Nelson indicated that he would not have granted the FIB Loan if he had known of the NFT Loan. It is thus apparent that the omission of the $100,000 NFT Loan from the debtor's financial statements may have played a critical role in the evaluation process and the granting of credit to the debtor. Therefore, the omission of the NFT Loan from the debtor's financial statements substantially distorted the debtor's financial picture and constituted a material misrepresentation.

## CONCLUSION

The omission of the $100,000 FIB Loan from the debtor's financial statements was a material misrepresentation within the meaning of section 523(a)(2)(B) of the Bankruptcy Code. We therefore reverse the holding of the bankruptcy court and remand this matter in order that the trial court determine whether FIB reasonably relied on the debtor's financial statements when it granted the FIB Loan and whether such statements were made or published with the intent to deceive.