**In re Gregory MASEGIAN, Debtor.**

**George GROTH, Clo Ann Groth and James C. Groth, Plaintiffs,**

v.

**Gregory MASEGIAN, Defendant.**

**Bankruptcy No. 989–03134–7.**
**Adv. No. 990–0026.**

United States Bankruptcy Court, E.D. California.

Nov. 27, 1991.

---

**404**

George M. Keele, of Sheerin, Walsh & Keele, Gardnerville, Nev., for plaintiffs.

Dan Nelson, of Law Office of Max Cline Stockton, Cal., for defendant.

## MEMORANDUM DECISION

ROBERT L. EISEN, Bankruptcy Judge.

This matter comes before the court on George, Clo Ann, and James Groth's (the "Groths") complaint to have a debt owed to them by Gregory Masegian ("Masegian") declared nondischargeable as a debt for property obtained by use of a false financial statement under Bankruptcy Code section 523(a)(2)(B).

## BACKGROUND

The Groths were the founders and owners of D & G Computer Systems of Nevada, Inc. ("D & G"), a computer retail outlet with stores in Reno and Carson City, Nevada. In 1987, the Groths decided to sell D & G and entered into negotiations with State Mortgage Co. ("State Mortgage") for the sale of D & G stock and assets. The parties eventually agreed on sale terms which included State Mortgage's issuance of a $320,000 promissory note. The note was personally guaranteed by Masegian who was a licensed attorney and the president as well as major stockholder of State Mortgage.

In connection with his personal guaranty of the note, the Groths requested Masegian to complete a written personal financial statement. In response to a question in the financial statement whether he was a party to a lawsuit, Masegian had written, "No." In fact, at the time of preparing the financial statement, Masegian was in the midst of defending a two-year old state-court lawsuit claiming liability on his personal guaranty of a State Mortgage note issued in connection with a separate State Mortgage transaction gone sour. Masegian was the only named defendant in the lawsuit which sought over $150,000 in damages. A selection of pleadings introduced into evidence at trial demonstrated that Masegian's involvement in the proceedings was active and substantial at the time the financial statement was prepared. The state-court litigation eventually concluded in judgment against Masegian for approximately $133,000.

The Groths assert that because Masegian failed to disclose the lawsuit in the financial statement, the court should determine the approximately $210,000 presently owing on the note nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code for a debt for money obtained through use of a false financial statement. Masegian contends that the Groths have failed to prove the required elements under section 523(a)(2)(B) and relief should be denied.

Section 523(a)(2)(B) of the Bankruptcy Code outlines four elements which must be proven by a creditor seeking to have a debt determined nondischargeable based on use of a false financial statement.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

U.S.C. § 523(a)(2)(B). The creditor must prove each of these four elements by a preponderance of the evidence. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Masegian contends the Groths' have failed to prove three of the four elements set forth in section 523(a)(2)(B). Specifically, Masegian claims the Groths failed to (1) prove the statement was materially false, (2) that he had an intent to deceive, and (3) that the Groth's reliance was reasonable.

*Materially False*

■■■■ A statement is materially false if it contains an important and substantial untruth. *In re Greene,* 96 B.R. 279, 283 (9th Cir.BAP 1989). A frequent litmus test used by court's evaluating whether an untruth is important and substantial is whether the falsehood had an effect on the creditor's decision-making process. Simply stated, a misrepresentation is deemed "material" if credible evidence is presented that the creditor would not have entered into the subject transaction had the truth been revealed. *See, e.g., In re Greene,* 96 B.R.

at 283; *cf. In re Bogstad,* 779 F.2d 370, 375 (7th Cir.1985).

■■■■ In this case, Masegian omitted information regarding a $150,000 contingent liability from his financial statement. Proper inclusion of this fact would have substantially tainted Masegian's financial picture which showed him enjoying a substantial net worth.[1] In addition, since the lawsuit involved guaranteed obligations of State Mortgage, its inclusion may also have triggered more meticulous research concerning the propriety of accepting State Mortgage as a buyer of the family business. The Groths emphatically testified at trial that had they known that Masegian was embroiled in a lawsuit for his guaranty of State Mortgage's defaulted obligation, they would not have accepted the note from State Mortgage and would have sought another of several willing buyers for D & G.

Although Masegian attacks the weight and credibility of the Groths' testimony in his post-trial briefs, the court is unconvinced by the arguments raised[2] and deter-

1. Masegian's financial statement indicated a net worth of $830,000. Subtracting the $150,000 contingent liability would reduce this figure to $680,000.

2. Masegian raises five specific points which he contends show that his answer to the lawsuit question did not even factor into the Groths' decision to accept the State Mortgage note and his personal guaranty: (1) the Groths were looking primarily to the ability of State Mortgage, not him, to service the note, (2) the Groths had obtained and were relying on a security interest on D & G's assets showing his guaranty was insignificant; (3) the Groths requested the financial statement late in the transaction showing its lack of importance; (4) the financial statement was on a form and there was no indication that the Groths cared about or would have asked about lawsuits absent the form; and (5) the lawsuit question has only recently become important as an aid to collection and was not important to the Groths at the time of the transaction.

Although these points would dilute somewhat the Groths' testimony that they would not have accepted the note and guaranty had they known of the lawsuit, these points were not developed sufficiently at trial or on cross-examination to discount the weight and credibility of the Groths' testimony. In addition, Masegian's points are no more than unsupported inferences which are easily rebuttable. First, in response

to Masegian's contention that the Groths were primarily looking to State Mortgage's reliability to service the note, the contrary could be inferred, that is, that the Groths' would not have even requested a personal guarantee had they felt comfortable with State Mortgage's ability. Second, with respect to the security interest in D & G assets, it was ultimately determined in other proceedings that the Groths' security interest was subordinate to the security interest of D & G suppliers. It could be assumed the Groths knew this or doubted the strength of their secured position when they accepted the note. Thus, it is not surprising that they demanded Masegian's personal guaranty to further protect themselves. Third, that the Groths' request for Masegian's financial statement occurred late in the transaction is more reasonably construed to demonstrate that Masegian's financial strength was determined—after reviewing the totality of the transaction—to be crucial. Fourth, Masegian's point that the financial statement was on a form and there was no indication that the Groths would not have asked about lawsuits absent the prepared financial statement form point begs the issue and is equivalent to claiming "I would not have lied if you did not ask the question." Moreover, disclosure of a $150,000 contingent liability would probably be required even in the absence of the question on the form. Finally, the Court simply fails to see any relevance of Masegian's point that the lawsuit only

mines the Groths' testimony to be credible and sufficient to prove that they would not have accepted the State Mortgage note and Masegian's personal guaranty had they known the truth. Masegian's false statement is, therefore determined to be "material."

### Intent to Deceive

At trial, Masegian defended his failure to truthfully answer the lawsuit question by claiming it was an innocent "mistake" and that he simply "forgot" the lawsuit when preparing answers to the financial statement. The Groths were unable to rebut Masegian's claim with direct evidence, and Masegian contends that his unchallenged testimony is sufficient to prove his lack of intent to deceive.

■ Notwithstanding the Groths' inability to present direct evidence of Masegian's intent to deceive, such direct proof is not required. Since direct proof of intent to deceive is nearly impossible to obtain, it may be inferred from proof of surrounding circumstances. *See, e.g., In re Simpson,* 29 B.R. 202, 211 (Bankr.N.D.Ia.1983). In this case, the evidence of circumstances surrounding Masegian's alleged innocent mistake convinces the court that intent to deceive is properly inferred. It is not credible that Masegian, an attorney and experienced businessman, could forget or consider insignificant an active lawsuit claiming $150,000 of personal liability in which he was the only named defendant. This court is unwilling to consider such a "mistake" innocent and lacking an intent to deceive.

Even giving Masegian the benefit of a shadow of a doubt with respect to intent, it is well-established that reckless indifference or disregard of the accuracy of a financial statement is sufficient to support a nondischargeability action under section 523(a)(2)(B). *See, e.g., In re Coughlin,* 27 B.R. 632, 636 (1st Cir.BAP 1983) (requirement of intent to deceive satisfied where debtor signed loan application without reading it); *Modern Distributors, Inc. v. Gray,* 22 B.R. 676 (Bankr.W.D.Wis.1982) (intent to deceive present where debtor saw

recently became important as an aid to collection absent evidence that the Groths were some-

financial statement and errors were such that he knew or should have known of their falsity). Again, considering Masegian's background and experience as an attorney and as president of a mortgage company, his "mistake" in failing to reveal the lawsuit and his further failure to carefully review his answers must be seen as reckless indifference or disregard of the accuracy of his information and further supports and establishes his intent to deceive.

### Reasonable Reliance

■ Masegian does not dispute that the Groths' actually relied on his false financial statement, but argues that because the Groths failed to verify its accuracy and further failed to conduct an independent investigation of his credit (which he alleges would have uncovered the lawsuit), the Groths' reliance was not "reasonable" as required by section 523(a)(2)(B)(iii).

The predecessor to the false financial statement exception to discharge in section 523(a)(2) of the Bankruptcy Code found at section 17(a)(2) of the Bankruptcy Act contained no statutory mandate that reliance on a false statement be "reasonable." Court's construing section 17(a)(2), however, frequently evaluated creditors' reliance in terms of requiring reasonable or justifiable reliance. The legislative history of section 532(a)(2)(B)(iii) clearly indicates that the Bankruptcy Code's new statutory requirement that reliance be "reasonable" was intended to codify the "reasonableness" inquiry as developed in pre-Code case law. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 132 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 78 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5963, 6093, 5864.

Courts which have carefully reviewed the "reasonable" reliance requirement developed in case law construing section 17(a)(2) have uniformly determined that reliance was deemed "unreasonable" only when circumstances indicated a lack of actual reliance. *See, e.g., In re Garman,* 643 F.2d 1252, 1255–60 (7th Cir.1980); *In re Richards,* 71 B.R. 1017, 1023 (Bankr.D.Minn.

how contemplating bringing a nondischargeability action after accepting the note.

1987); *In re Allen,* 65 B.R. 752, 760 (E.D.Va.1986). Summarizing three recurring factual scenarios where reliance would be determined unreasonable by courts evaluating reliance under section 17(a)(2), the court in *Allen* stated:

First, reliance would be considered unreasonable if the creditor knew that the information on the financial statement was false. *See, e.g., Swint v. Robins Federal Credit Union,* 415 F.2d 179 (5th Cir.1969) (creditor knew debtor had omitted two substantial debts from financial statement). Second, reliance would be held unreasonable if the statement did not contain sufficient information to realistically portray the debtor's financial status. *See, e.g., In re Adams,* 368 F.Supp. 80 (D.S.D.1973) (form contained only blanks for creditors' names and amounts of debts; no procedure "for the recording of assets, a statement of monthly payments, or a credit report"). Third, reliance would be deemed unreasonable if, before extending credit, the creditor became aware of some information inconsistent with the accuracy of the financial statement. *See, e.g., Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971) (creditor's knowledge of debtor's increasing difficulty in making payments and of commercial failures was inconsistent with the information given on the financial statement).

65 B.R. at 760.

There appears to be no case law construing section 17(a)(2) which would, absent the type of circumstances listed above, deem a creditor's reliance on a false financial statement unreasonable because it failed to verify the accuracy of false information or conduct an independent credit check of a debtor. While the legislative history to section 523(a)(2)(B) mentions that "a creditor often has sources of information, such as credit bureau reports, to verify the accuracy of a debtor's list of debts on a financial statement," a careful reading discloses that this statement is a recognition of creditors' unprincipled practice of using forms or providing instructions that produce an incomplete financial picture of the debtor and then later suing the debtor claiming

intentional fraud based on the debtor's signing a declaration regarding the completeness of the statement. *See* H.R.Rep. No. 95–595, at 130–31, U.S.Code Cong. & Admin.News 1978, at 6091–6092. Rather than clear legislative intent that creditors have an affirmative duty to verify the accuracy of false financial statements, this legislative guidance is consistent with pre-Code case law which would evaluate conduct and other relevant circumstances to distinguish whether a claim of reliance at the time of extending money or property was credible or merely an after-the-fact claim to have a debt declared nondischargeable. *See In re Hough,* 111 B.R. 445, 450 (Bankr.S.D.N.Y.1990).

Despite lack of legislative support establishing an affirmative investigatory duty, a substantial number of courts construing the reasonableness requirement of section 523(a)(2)(B)(iii) have determined nondischargeability claims based on whether creditors independently investigated the debtors' financial health or verified the accuracy of information provided in false financial statements. *See, e.g., In re Breen,* 13 B.R. 965 (Bankr.S.D.Ohio 1981); *In re Weiss,* 42 B.R. 314, 316 (Bankr.E.D.Pa. 1984); *In re Harms,* 53 B.R. 134 (Bankr. D.Minn.1985).

The court acknowledges this line of precedent but declines to follow it. First, the court is in accord with the court in *Allen* which adroitly noted, "[t]he problem with cases placing a duty of verification on creditors is that the duty appears to derive not from congressional intent but from judicial revision." 65 B.R. at 752. In addition, opinions imposing an affirmative duty on creditors to conduct an independent credit check of debtors or to verify a financial statement suffer from logical and practical inconsistencies. As the Ninth Circuit noted in *In re Lansford,* 822 F.2d 902, 904 (9th Cir.1987), the affirmative duty defense is "unseemly" in that it allows a debtor to intentionally mislead its creditor by supplying false information and then "argue that he should be excused from section 523 because the [creditor] believed him." *Id.* at 904. The judicially-created affirmative

duty defense has been further critized as foisting a negligence doctrine into the realm of intentional torts as well as creating a situation where a debtor could deny reliance altogether by claiming that the creditor relied not on the debtor's false financial statement, but on the creditor's own independent investigation. *See, e.g., In re Richards,* 71 B.R. 1017, 1021–22 (Bankr.D.Minn.1987).

The fact that the Groths failed to conduct an independent investigation of Masegian's false financial statement does not taint the testimony and evidence presented of actual reliance, and the court finds this element of section 523(a)(2)(B) established by a preponderance of the evidence.

■ Even if the court were to accept the affirmative duty line of cases as controlling, the court would determine that Masegian has failed to rebut the Groths' showing of reasonable reliance. As the court in *Harms* noted, what constitutes reasonable reliance depends on the circumstances.

The emerging standard of reasonableness requires the court to measure that creditor's actual conduct in the case at bar against three different factors: the creditor's standard practices in evaluating creditworthiness; the standards or customs of the creditor's industry in evaluating creditworthiness; and the surrounding circumstances existing at the time of the debtor's application for credit.

*Harms,* 53 B.R. at 141 (citations omitted). In this case, the Groths were relatively unsophisticated owners of a family business. They had no established practices for checking creditworthiness, no reason to suspect that Masegian provided false information about lawsuits against him, and limited resources by which to verify the information given. Further, the court is unconvinced that a routine credit check or "reasonable" efforts to verify information given would have disclosed the pending lawsuit. The only practical way this court can surmise to find out about the pending lawsuit would have been to check the dockets of every jurisdiction where it was possible that Masegian could be sued. Even follow-

ing the cases championed by Masegian, these circumstances clearly dismantle any attempt to show the Groths' reliance unreasonable.

### CONCLUSION

Based on the foregoing, the court determines the debt owed by Masegian to the Groths to be nondischargeable. The Groths have proved all requisite elements for a finding of nondischargeability under section 523(a)(2)(B) and, therefore, declares the debt nondischargeable.

The foregoing Memorandum Decision constitutes Findings of Fact and Conclusions of Law as required under Rule 7052, Rules of Bankruptcy. Counsel for the Groths is directed to prepare a proposed judgment consistent with this decision. The proposed judgment shall be served on all opposing counsel and be lodged with the court with a proof of such service.