**In re Marty John HOPPEL and Tracy Lynn Hoppel, Debtors.**

**LAUREL FEDERAL CREDIT UNION, Plaintiff,**

**v.**

**Marty John HOPPEL and Tracy Lynn Hoppel, Defendants.**

Bankruptcy No. 94–10983–13.
Adv. No. 96/00055.

United States Bankruptcy Court,
D. Montana.

Jan. 9, 1997.

James A. Patten, West, Patten, Bekkedahl & Green, P.L.L.C., Billings, MT, and Ronald D. Allie, Allie Law Firm, Billings, MT, for Plaintiff.

Jerrold L. Nye, Nye & Meyer, P.C., Billings, MT, for Defendants.

### ORDER

JOHN L. PETERSON, Chief Judge.

In this adversary proceeding, after due notice, trial was held November 12, 1996, at Billings on the complaint of Laurel Federal Credit Union (LFCU) to Revoke Confirmation. Both Plaintiff and Defendant appeared through counsel. Debtor Marty Hoppel testified as did Larry Hagen, President of LFCU, and Exhibits 1, B and C were admitted into evidence. At the close of trial, the Court granted the parties ten days to file memorandum and took the matter under advisement. Both parties have submitted their post-trial briefs and the matter is ripe for decision.

Debtors filed a voluntary Chapter 13 petition on July 11, 1994. LFCU filed a Proof of Claim, to which Debtors objected, and after notice and hearing, the Court fixed the amount of LFCU's secured claim at $17,-250.00. Debtors' Third Amended Chapter 13 Plan, which provided for payment in full of LFCU's $17,250.00 claim, was confirmed on March 23, 1995. At the time Debtors' Third Amended Chapter 13 Plan was confirmed, the following collateral secured LFCU's claim: Honda Accord; three-wheeler; trailer with electric winch; GMC pick-up with a large block engine; Chevrolet Suburban with a large block engine; and a Camaro used for drag racing.

During the latter part of 1995, LFCU heard rumors that Debtors had sold the racing Camaro. The rumors prompted LFCU to file a Motion to Lift Automatic Stay on December 7, 1995. In response to LFCU's motion to lift stay, Debtor Marty Hoppel sent a letter to LFCU stating that he had disposed of the body of the Camaro in order to obtain an updated chassis, but that "the motor, transmission, fuel system, electronics, and complete drive-train system (collectively referred to as "motor") never went with the body and is still right here in my garage and has a value of at least $11,000.00." Debtors also filed a Fifth Amended Plan which provided that LFCU's collateral would be surrendered in full satisfaction of LFCU's secured claim. In reliance on the letter written by Marty Hoppel, stating that the value of the Camaro's motor was $11,-000.00, the bank did not object to confirmation of Debtors' Fifth Amended Plan, which was confirmed by this Court on January 22, 1996.

Sometime after confirmation of Debtors' Fifth Amended Plan, LFCU retrieved portions of its collateral from Debtors. However, LFCU was unable to obtain possession of the Camaro—either the body or the motor. In addition, the GMC pick-up and the Chevrolet Suburban were returned to LFCU with small block engines instead of large block engines and the trailer was returned without the electric winch. Because portions of the collateral had been altered, and because LFCU had been unable to obtain possession of the Camaro, LFCU filed April 26, 1996, a Motion to Revoke Confirmation. Hearing on LFCU's motion was held May 14, 1996. However, an adversary proceeding, rather

than a motion, is the required procedural vehicle for revocation of a confirmed plan. *See* F.R.B.P. Rule 7001(5). Thus, LFCU's motion was denied in an Order dated July 8, 1996. In response to this Court's Order, LFCU filed the instant adversary proceeding on July 18, 1996.

At trial, Debtor Marty Hoppel ("Marty") testified that he blew up the motor of the racing Camaro while competing in a drag race in Douglas, Wyoming. Marty also testified that the damage to the motor was so severe that it could no longer be used. Consequently, Marty claims he threw the motor away and sold the Camaro body. Marty later testified that he traded the Camaro for a boat. When questioned further by counsel for LFCU regarding the letter that was sent sometime after December 7, 1995 (the date LFCU filed its Motion to Lift Stay), which stated that Debtors still had the motor, Marty stated that he could not remember specific dates and that he was not sure of what was going on. Finally, Marty testified that he could not remember when the race was in Douglas, Wyoming, but admitted that the race occurred sometime in November 1995, or before.

Based on the above chain of facts, LFCU seeks to revoke confirmation of Debtors Fifth Amended Chapter 13 Plan pursuant to 11 U.S.C. § 1330(a),[1] which provides:

Revocation Of An Order Of Confirmation

(a) On request of a party in interest at any time within 180 days after the date of the entry of an order of confirmation under section 1325 of this title, and after notice and a hearing, the court may revoke such order if such order was procured by fraud.

■ Courts are reluctant to grant revocation of confirmed plans because there is a strong presumption in favor of finality. *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3rd Cir.1988). Moreover, 11 U.S.C. § 1327(a) provides that once a debtor's Chapter 13 plan is confirmed:

The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

11 U.S.C. § 1327(a). Thus, a court must balance the interests of finality against the interests of the plaintiff when determining whether revocation is appropriate under section 1330. *See also In re Szostek,* 886 F.2d 1405, 1408 (3rd Cir.1989).

■ With this in mind, the Court will embark upon its analysis of whether the facts of this case warrant revocation. There are two elements under § 1330(a). First, a party in interest must file a complaint objecting to discharge within 180 days of the confirmation order. Second, the order of confirmation must have been procured by fraud.

Debtors first dispute whether LFCU filed its complaint within 180 days of the confirmation order. Debtors argue that the 180–day period began on March 23, 1995, the confirmation date of the Third Amended Plan, rather than January 16, 1996, the confirmation date of the Fifth Amended Plan. LFCU argues to the contrary. Neither side provided authority to support their respective positions. However, upon review of the Bankruptcy Code and case law, the Court agrees with LFCU, and finds that the 180–day period began anew on January 16, 1996.

11 U.S.C. § 1329(b), relating to modification of plans after confirmation provides: (b)(1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.

(2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.

Following notice and hearing, Debtors' Fifth Amended Chapter 13 Plan was confirmed by this Court, pursuant to U.S.C. § 1329, on January 22, 1996. Thus, pursuant to the

---

1. There are correlative provisions for Chapter 11 and Chapter 12. 11 U.S.C. §§ 1144 and 1230. Since sections 1144, 1230 and 1330 contain virtually identical language, cases addressing the 180–day statute of limitations period under ei-

ther §§ 1144 or 1230 are equally applicable to § 1330. *Traders State Bank of Poplar v. Mann Farms, Inc. (In re Mann Farms, Inc.),* 917 F.2d 1210, 1214 (9th Cir.1990).

Order dated January 22, 1996, Debtors' Fifth Amended Chapter 13 Plan replaced the Third Amended Chapter 13 Plan and became the Plan that controls this case. More importantly, January 22, 1996, the confirmation date of the Fifth Amended Plan, was the date from which the 180–day statute of limitations period began. *See In re TM Carlton House Partners, Ltd.,* 110 B.R. 185, 189 (Bankr.E.D.Pa.1990) (pursuant to 11 U.S.C. § 1127(b), a court approved modified plan becomes the plan, and the date upon which the modified plan is confirmed "establishes the date of that order as to the date from which the time limit for filing a complaint seeking revocation of confirmation must be filed pursuant to § 1144."). Additionally, the Court in *TM Carlton House,* found support in RESTATEMENT (SECOND) OF JUDGMENTS, § 15, at 143 (1982), for its position: "[W]hen in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in a third action under the rules of *res judicata." TM Carlton House,* 110 B.R. at 189.

■ Logic also dictates that the 180–day period starts upon confirmation of a modified plan, as long as it is the modified Plan that is procured by fraud. The 180–day period should start upon confirmation of a plan that is procured by fraud, whether it be the original plan or a modified plan. If a modified plan is confirmed after an original plan has been confirmed, and it is the original plan that was procured by fraud, then the confirmation of the original plan starts the 180–day period. However, if it is the confirmed modified plan that was procured by fraud, then the 180–day period starts upon confirmation of the modified plan. In the instant adversary proceeding, it is Debtors' Fifth Amended Chapter 13 Plan which LFCU claims was procured by fraud, thus, the 180–day period starts on the date of confirmation of the Fifth Amended Plan. Such a finding also comports with the Ninth Circuit's holding in *Dale C. Eckert Corp. v. Orange Tree Associates, Ltd. (In re Orange Tree Associates, Ltd.),* 961 F.2d 1445 (9th Cir.1992):

The Modified Order may have clarified some ambiguities, but it created another: There were now two orders confirming the plan, one entered June 6, the other September 6. Eckert contends the 180–day period in section 1144 should run from the later order, making Eckert's March 3, 1989 complaint timely. New West contends the 180 days ran from the first order, requiring dismissal of the complaint. We agree with the bankruptcy court and the BAP that the 180–day period ran from the June 6 order.

\* \* \* \* \* \*

When the June 6 order was entered, parties in interest were on notice they had a limited time to seek revocation on the ground of fraud. They could not rely on the fortuity that later events might extend the deadline. Eckert's complaint was directed solely to fraud in the procurement of the June 6 confirmation order. The complaint alleges the vote on the reorganization plan was tainted because Orange Tree and New West did not disclose their true relationship, and because ballots were tabulated incorrectly. The only vote taken preceded entry of the June 6 order; no new vote was taken before entry of the September 6 order. Since the second confirmation order was unrelated to the alleged fraud, entry of that order provided no excuse for extending the limitations period for challenging the initial order.

\* \* \* \* \* \*

In referring to "the date of the entry of *the* order of confirmation" (emphasis added), section 1144 makes clear it contemplates the entry of only *one* such order, unless the order is revoked for fraud or the plan is modified after confirmation pursuant to the procedures set forth in section 1127(b). *See also* 11 U.S.C. § 1129(c) ("except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title"). As we have noted, entry of the September 6 order was not preceded by compliance with the conditions imposed by section 1127(b) for modification of a confirmed plan.

*Orange Tree Associates,* 961 F.2d at 1447–1448 (footnote omitted). In this case, LFCU

alleges that Debtors' Fifth Amended Plan was procured by fraud. Furthermore, this Court's Order dated January 22, 1996, was preceded by compliance with the conditions imposed by § 1329 for modification of plans after confirmation. Therefore, the 180-day period in this case started on January 22, 1996.

 Since LFCU's complaint is not time-barred, the final issue is whether Debtors' Fifth Amended Chapter 13 Plan was procured by fraud. Congress did not define "procured by fraud" for purposes of revoking confirmation, thus, this Court finds that a plaintiff must prove the traditional common law elements of fraud: "that the debtor made a representation that was materially false; that the misrepresentation was either known by the debtor to be false, or was made without belief in its truth, or was made with reckless disregard for the truth; that the representation was made to induce the court's reliance; that the court relied on the representation; and that as a consequence of such reliance the confirmation order was entered." *In re Szostek,* 93 B.R. 399, 403 (Bankr.E.D.Pa.1988) (addressing fraud pursuant to 11 U.S.C. § 1330), *rev'd on other grounds, In re Szostek,* 886 F.2d 1405 (3rd Cir.1989); RESTATEMENT (SECOND) OF TORTS (1976) §§ 525–557A; *Field v. Mans,* — U.S. —, — – —, 116 S.Ct. 437, 443–444, 133 L.Ed.2d 351 (1995) (the determination of fraud under § 523(a)(2)(A) is a question of federal law, not state law, and courts should interpret these elements consistent with the common law definition of "actual fraud," as set forth in the Restatement (Second) of Torts (1976)); *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (setting forth the common law elements of fraud in a non-dischargeability action). Additionally, as the Seventh Circuit explained:

> There is no general rule for determining what facts will constitute fraud, but it is to be found or not according to the special facts of each particular case. It is rarely susceptible of direct proof, but must ordinarily be established by circumstantial evidence and legitimate inferences arising therefrom, which, taken as a whole, will show the fraudulent intent or purpose with which the party acted.

*Connolly v. Gishwiller,* 162 F.2d 428, 433 (7th Cir.1947).

Applying the specific facts of this case to the common law elements of fraud, the Court finds that LFCU has shown, by a preponderance of the evidence, that Debtors' Fifth Amended Plan was procured by fraud. Marty, in his letter to LFCU, made a false statement when he represented that he still had possession of the racing motor and that its value was at least $11,000.00. Marty's statement in the letter blatantly contradicts his later trial testimony. At trial, Marty testified that the motor of the Camaro blew-up at a drag race in Douglas, Wyoming, and that the race occurred sometime in November of 1995, or before. Yet, Marty did not write the letter to LFCU until sometime after December 7, 1995. Thus, Marty misled LFCU when he represented that the motor was still in his possession, and that its value was $11,000.00. Moreover, Debtors misled the Court when, at the hearing on Debtors' Fifth Amended Chapter 13 Plan, they failed to inform the Court that a major portion of LFCU's collateral had been sold, traded and/or destroyed.

The above demonstrates that Debtors made several false statements. In addition, the statements had a material impact on the Court's decision to confirm Debtors' Fifth Amended Chapter 13 Plan. In a recent non-dischargeability action, the Ninth Circuit addressed the issue of materiality:

> A statement can be materially false if it includes information which is "substantially inaccurate" and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths.

*Candland v. Insurance Company of North America (In re Candland),* 90 F.3d 1466, 1470 (9th Cir.1996) (*citing In re Greene,* 96 B.R. 279, 283 (9th Cir. BAP 1989)). Although the Ninth Circuit was addressing a non-dischargeability compliant, the reasoning pertains to the instant action.

Debtors' misstatements and omissions were material because had LFCU known the truth, it would have had the opportunity to object to confirmation of the Fifth Amended Plan. Given an objection by LFCU, the Court would have been precluded from confirming the modification. Section 1329, which sets forth the requirements for modification of a plan after confirmation, adopts by reference, the requirements of § 1325(a). Section 1325(a)(5) provides:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—(5) with respect to each allowed secured claim provided for by the plan—
>
>> (A) the holder of such claim has accepted the plan;
>>
>> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>>
>> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
>>
>> (C) the debtor surrenders the property securing such claim to such holder;

■ The requirements of § 1325 are mandatory, not discretionary:

> We conclude that, like the requirement of 11 U.S.C. § 1325(3), the requirement of § 1325(a)(5)(B)(ii) is mandatory. The bankruptcy court cannot confirm a plan of reorganization that does not comply with this requirement. Here, the value of the property to be distributed during the term of the five-year plan on account of the allowed secured claim is $25,703.25. This is less than the allowed amount of the secured claim, $43,000 plus interest, and the Debtors have not surrendered the property securing the claim.

*Barnes v. Barnes (In re Barnes)*, 32 F.3d 405 (9th Cir.1994). In this case, Marty's misrepresentations and omissions contained important and substantial untruths because the Camaro did not exist at the time Marty wrote the letter to LFCU or at the time of the hearing on Debtors' Fifth Amended Chapter 13 Plan. Thus, the Camaro could not be surrendered pursuant to § 1325(a)(5)(C). Consequently, Debtors had to satisfy either § 1325(a)(5)(A) or (B). Larry Hagen testified that had LFCU known of the Camaro's non-existence, LFCU would have objected to confirmation. Therefore, Debtors would have had to satisfy the requirements of § 1325(a)(5)(B)(ii). Because Debtors' Fifth Amended Plan proposed to pay LFCU nothing on its remaining claim, the Court would have been prohibited from confirming the Plan.

Furthermore, at trial, Larry Hagen testified that there was still approximately $8,800.00 owing on LFCU's $17,250.00 claim. This is consistent with previous values assigned the individual items of collateral by this Court. At a hearing to fix the amount of LFCU's secured claim, the Court assigned a value of $8,000.00 to the Camaro, which was what an appraiser determined to be the Camaro's wholesale value. This, in conjunction with the alterations to the other collateral, demonstrates that Debtors prevented LFCU from collecting on over half of its claim. Moreover, Debtors' failure to disclose the worthlessness of the Camaro lead the Court to believe that LFCU would receive all of its collateral. Thus, Plaintiff has also satisfied the fourth and fifth elements of fraud—Debtors' representations were made to induce the Court's reliance and as a consequence of such reliance, the confirmation Order was entered.

Finally, Debtors knew at the time that they wrote the letter to LFCU and at the hearing on confirmation of the Fifth Amended Chapter 13 Plan that there was absolutely nothing left of the racing Camaro. The body had been admittedly sold or traded and the motor had been thrown away. Furthermore, Debtors knew that at least one of the large block engines had been supposedly thrown away while the other large block engine had been removed because it was leaking oil. In addition, the winch on the trailer had been removed sometime before the trailer was returned to LFCU. Clearly, all the elements of fraud have been satisfied. The facts of this case leave no doubt that Debtors' misrepresentations and omissions were purposely made to procure confirmation of the Fifth Amended Chapter 13 Plan.

Based on the foregoing, this Court will revoke its Order dated January 22, 1996.

Thus, Debtors' Third Amended Chapter 13 Plan again controls this case. However, since LFCU was able to collect on a portion of its claim, the proceeds from the sale of the collateral returned to LFCU, by Debtors, shall be subtracted from the balance owing on LFCU's claim as of January 22, 1996.

IT IS THEREFORE ORDERED a separate Judgement on the merits shall be entered in favor of Plaintiff, Laurel Federal Credit Union, and against Defendants, Marty and Tracy Hoppel, and this Court's Order dated January 22, 1996, is revoked pursuant to 11 U.S.C. § 1330.