In re Peter G. OSBORNE, Debtor.

Deutsche Financial Services Corporation, formerly ITT Commercial Finance, a Nevada corporation, Plaintiff,

v.

Peter G. Osborne, an individual, Defendant.

Bankruptcy No. 99–48615.
Adversary No. 00–01117–EC.

United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

Nov. 17, 2000.

Dennis M. Young, Lillick & Charles, LLP, Costa Mesa, CA, for plaintiff.

James R. Felton, Greenberg & Bass, Encino, CA, for defendant.

### *ORDER*

JOHN L. PETERSON, Bankruptcy Judge.

This adversary proceeding came on for trial before the Hon. John L. Peterson, United States Bankruptcy Judge, sitting by designation of the United States Court of Appeals for the Ninth Circuit, after due notice, on October 31, 2000. The plaintiff Deutsche Financial Services, Inc. ("DFS") was represented by Dennis M. Young, Esq., and the defendant by James R. Felton, Esq. Witnesses Anthony Watson, Mark Kulmacz, and Dale George testified for the Plaintiff. The defendant Peter Osborne was called as an adverse witness by the plaintiff and also testified on his own behalf together with witnesses Eva Jeffers. Plaintiff's Exhibits 1, 2, 9, 11, 12, 13, 14, 15, 16, 21, 24, 26, 29, 37, 38, 39, 66, 70 and 71 were admitted during trial[1]. Plaintiff's Exhibit 60 was refused admission. Defendant's Exhibits 101, 102, 115, 176, and 177 were admitted into evidence at trial. A number of other exhibits were submitted by the parties prior to trial but not introduced or ruled upon during trial. A joint Pre–Trial Order was approved by the court prior to trial. The parties have submitted closing briefs in support of their respective positions and the court having reviewed the briefs and evidence enters its judgment in favor of the defendant.

### JURISDICTION

This case is a core proceeding under 28 U.S.C. § 157(b)(2)(I) to determine the dischargeability of plaintiff's debt owed by the defendant. Plaintiff asserts the debt is non-dischargeable under 11 U.S.C. § 523(a)(2)(B)[2]. The court ruled at the outset of trial that plaintiff's debt is fixed in the sum of $2,984,621.10 based on a final arbitration award between the parties.

### ADMITTED FINDINGS OF FACT

Under the Pre–Trial Order the following facts are admitted and require not proof:

A. On or about September 23, 1994, the Bank of America, NT & SA ("BofA") as lender, extended to Automotive Distributors of the Far West ("ADF"), a line of credit with an expiration date of September 30, 1995 (the BofA Loan).

B. Peter Osborne personally guaranteed the BofA loan.

C. On October 25, 1995, ADF executed its promissory note in the principal amount of $500,000.00, plus interest, made payable to Vivian Vicando ("Vicando") in connection with $500,000 which was received by ADF. The $500,000 check written by Vicando was made payable to Osborne. The $500,000 borrowed by Vicando was used by ADF to pay BofA.

D. Peter Osborne personally guaranteed the obligations of ADF to Vicando.

---

1. At the outset of trial, most exhibits were deemed admitted as to foundation because they were copies of business records. The issue as to relevance was left for trial.

2. Section 523(a)(2)(B) reads:

   A discharge under section 727 does not discharge an individual debtor from any debt—
   ****

   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
   ****
   (B) use of a statement in writing—(i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive....

E. Peter Osborne signed and submitted a loan application and financial statement to DFS.

F. Peter Osborne signed a personal continuing guaranty of all the obligations of his company (ADF) owed to DFS.

G. On March 23, 2000, DFS filed its application to confirm the arbitration award—the U.S. District Court case as Case No. 99–09500 MMM (RNBx). The matter is still pending before U.S. District Court Judge Margaret Murrow.[3]

## ISSUES OF FACT AND LAW

The plaintiff seeks denial of discharge of its debt owed by Osborne stemming from his guaranty of the ADF claim. Plaintiff contends the personal financial statement of Osborne, dated 5/1/95, given to plaintiff was materially false, that plaintiff reasonably relied on the statement and defendant gave each statement with the intent to deceive the plaintiff. Defendant does not dispute that material matters in the financial statement were false or inaccurate, but that the plaintiff knew of such falsehoods and yet proceeded to close the ADF loan, so that plaintiff did not reasonably rely on such financial statement.

## FINDINGS OF FACT

In addition to the agreed findings of fact, the court makes the following findings of fact based on the evidence submitted at trial. Osborne was 100% stockholder of ADF, a company that is now under Chapter 11 of Title 11 of the Code. ADF made a "Financing Application" to DFS, which was typed by a DFS employee, and signed by Defendant on December 13, 1995. The application provided that Osborne was to be a personal guarantor of DFS's loan to ADF. ADF was incorporated on October 1, 1994, and was seeking financing of its business. The loan application was originated for DFS by its employee Edward

Stefano and was processed through credit departments of DFS. One of the loan policies of DFS was that in the case of a wholly-owned corporation, the stockholder was required to provide a personal guaranty of the corporate loan. ADF ultimately sought and received on February 1, 1996, a secured revolving credit facility from DFS for four and one-half million dollars, secured by the ADF"s accounts receivables and inventory.

In the course of DFS' credit analysis and investigation, the loan application went through several reviews and source verifications by employees of DFS, including witnesses Kulmacz and George, together with employees of their departments. Kulmacz was manager of business development and regional vice president of DFS in the Los Angeles Technology Office, while George, a recent employee of DFS beginning in 1995, was regional branch manager. One Kathy Clary was given the job to analyze and "spread" the information given by Osborne on his financial statement. Pl. Exhibit 2, the Personal Financial Statement, attached to this Order, and which provides the source of dispute in this case, shows Osborne represented having a total net worth (total assets minus total liabilities) of $9,107,228.00. The basis for the net worth in part included defendant's residence at 2715 Frances, La Crescenta, CA, at $450,000, with no listed mortgage, other real estate of $4,925,000, with mortgages of $1,429,704, ADF investment of $1,000,000, Daytona Ignition, an ADF affiliate (Pl.Ex. 1) investment of $3,639,805, and United Cores, Investment, another affiliate, at $500,000.

Turning to Schedule 1, of Ex. 2, Osborne listed ownership interest in 1516 Princes, 1520 Ditman, and the Fowler properties at 100%. The evidence is undisputed that

---

3. The agreed Pre–Trial Order was modified at plaintiff's request to provide that on September 18, 2000, Judge Morrow issued an Order confirming the arbitration award in the

amount of $2,984,021.10. The plaintiff sought and was denied partial summary judgment in the case *sub judice* based on the arbitration award.

Osborne only owned a one-third interest in such properties [4].

Part of DFS Company's policies in making commercial loans of the type granted to ADF, included a credit analysis, which includes a financial statement "spread", credit reports such as Dun & Bradstreet, direct trade references of ADF and personal investigation and verification of the assets of the guarantor. In this regard, the first page of Pl.Ex. 2 shows an analysis by one Kathy Clary, an employee supervised by George. The "spread" lists the "Tangible Net Worth" of Osborne's personal financial data at $3,917,400.[5]

Kulmacz reviewed the spread analysis and formed the opinion that a tangible net worth of $3.9 million being 80% of the total loan facility of $4.5 million was a factor to justify the loan. In fact, Kulmacz stated the loan would not have been approved without that net worth of Osborne.

■ In making the investigation of Osborne's assets, George testified that he directed his staff personnel to check on the phone to verify the ownership of the properties listed in Schedule 1 of Exhibit 2. In addition to the phone check, George also insisted upon receiving a written report known as a lot book report from "MFI".[6] This report was received prior to loan funding. Ironically, the lot book reports are now missing from the loan file and George had no idea how they disappeared.[7] It is obvious, however, that lot book reports would certainly have disclosed that Osborne's ownership in the Ditman and Fowler Street properties was not 100%, but rather a ⅓ ownership. This is evident

from Plaintiff Exhibits 176 and 177, introduced through witness Eva Jeffers. Those exhibits are copies of grant deeds and deeds of trust for the Ditman and Fowler properties showing the ⅓ ownership of Osborne together with mortgages against the Ditman property to Bo–Den for $350,000. Jeffers further testified that these reports were given to Mr. Stefano of DFS in January, 1996, before the loan funding was made on February 1 of that year. Indeed, Bo–Den was to provide a subordination of its mortgage to DFS, after Stefano asked Jeffers to provide the information concerning outstanding liens against the real property. Stefano was never called as a witness to refute Jeffers' testimony.[8]

■ One other matter concerning nondisclosure of Osborne's is set forth in plaintiff's brief concerning a promissory note dated October 28, 1995, in the sum of $2,623,133.65 from ADF to Jeffers together with an unrecorded security agreement in the ADF inventory. No testimony was elicited on this matter and plaintiff's proposed Exhibit 5, which contains the note and security agreement, was never offered into evidence. It appears the obligation is strictly one of ADF and would have no bearing on Osborne's personal financial statement. It is well settled that neither statements of counsel, nor exhibits not admitted into evidence, are evidence. *Exeter Bancorporation, Inc. v. Kemper Securities Group*, 58 F.3d 1306, 1312 n. 5 (8th Cir. 1995); *In re Nielsen*, 211 B.R. 19, 22 n. 3 (8th Cir. BAP 1997); *In re White*, 168 B.R. 825, 830 (Bankr.Conn.1994) (legal memoranda are not evidence); *In re Honeycutt*,

4. Plaintiff contends the grant deeds to the properties (Ex. 177) show ownership in Thomas and Eva Jeffers and Peter Osborne, thereby given Osborne only a ⅓ interest. However, Osborne's testimony is the only evidence in the record that he owned 50% interest, with Jeffers, as husband and wife owning the other 50%. The grant deeds can be construed to give Osborne only a ⅓ interest.

5. Clary did not testify and George did not explain how this figure was computed.

6. This entity is not further identified in the record.

7. The failure of a party to provide evidence peculiarly available to that party supports an inference that the truth would be damaging to that party. *United States v. Knox*, 68 F.3d 990, 1000 (7th Cir.1995); *In re Bicoastal Corp.*, 149 B.R. 212, 214 (Bankr.M.D.Fla. 1992).

8. See footnote 7.

198 B.R. 314 (Bankr.E.D.Ark.1996) (statements of counsel in briefs or during trial are not evidence).

## CONCLUSIONS OF LAW

■ We begin with certain caveats applicable to a non-dischargeability complaint under § 523(a)(2)(B). The Ninth Circuit Court of Appeals imposes a "weighty burden" on creditors, strictly construing exceptions to discharge in favor of debtors in order "to effectuate the Congressional policy" of affording debtors a "fresh start". *Gregg v. Rahm (In re Rahm)*, 641 F.2d 755, 756–57 (9th Cir. 1981). A creditor, to sustain its burden, must establish each element of § 523(a)(2)(B) by a preponderance of the evidence, thereby putting the burden of proof on the creditor. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ *In re Candland*, 90 F.3d 1466, 1469 (9th Cir.1996), citing *In re Siriani*, 967 F.2d 302, 304 (9th Cir.1992), holds in discussing the elements of § 523(a)(2)(B):

We have reworded these requirements as follows:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable,

(7) that damage proximately resulted from the representation.

■ On the issue of materiality, *Candland, supra,* at 1470, adopted the test set forth in *In re Greene*, 96 B.R. 279, 283 (9th Cir. BAP 1989) calling it a "less stringent materiality definition", to-wit:

A statement can be materially false if it includes information which is "substantially inaccurate" and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths. [*quoting Greene*].

■ *Candland* explains:

Material misrepresentations for this statutory section are substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision. This definition builds upon [*In re Lansford*, 822 F.2d 902 (9th Cir.1987)], which concluded that a "finding of materiality is supported by the multiple misrepresentations contained in the financial statement as to assets and their value." *Lansford,* 822 F.2d at 904.

*Candland,* 90 F.3d at 1470.

■ On the issue of material misrepresentation of fact, I conclude the financial statement was clearly inaccurate and false as to the ownership interest of Osborne in the Ditman and Fowler properties, listed at "100%", when in fact Osborne owned only a ⅙ interest. Osborne maintained at trial he owned a 50% interest and that the "Estimated Market Value" placed on Schedule 1 for each property was equal to that amount, so the full market value would be double, thereby raising the total value up to $3,850,000 from $1,925,000. But that testimony is unworthy of belief because Osborne only owned ⅙ interest. Furthermore, any reasonable investor in examining the schedule would conclude that the true market value for 100% ownership interest was as stated on the schedule. This is so because when Osborne listed the property at 2728 Frances, at 50%, he specifically listed the value at $125,000 with a parenthetical addition "(100% = $250,000.)". Therefore, not only are the ownership interests materially false, so is the estimated market value overstated by over $1.2 million.

■ I also conclude that DFS used the false figures in making its decision to fund the $4.5 million credit facility. The evi-

dence is without dispute that DFS, following corporate policy to seek a personal guaranty of the sole stockholder of the corporation borrower, "spread" the financial statement and fixed the tangible net worth at $3,917,400, using Osborne's inaccurate value figure. This figure became an important part of DFS' decision to fund the credit line. It was important to DFS to have a substantial guarantor to make the ADF loan.

I conclude further the deception was intentional. Osborne knew he did not own 100% of all the subject properties. He further knew that he had additional encumbrances to Bo–Den for $850,000 against the 44 St. property and mortgage of $350,000 against the family residence— which he did not include or list on the financial statement. These omissions, with the inflated valuations, were knowingly false and intentionally deceptive to any lender who used the financial statement in the decision making process.

As stated in *In re Gertsch,* 237 B.R. 160, 167 (9th Cir. BAP 1999):

> The scienter requirement for a fraudulent misrepresentation is established by showing "either actual knowledge of the falsity of the statement, or reckless disregard for its truth . . . ." *In re Houtman,* 568 F.2d 651, 656 (9th Cir.1978).

DFS has proven by a preponderance of the evidence that the representations of 100% ownership was knowingly false because Osborne knew it to be false and so admitted in open court. Osborne's attempt to extricate himself from these false statements is not saved by his self-serving testimony that the listed values were still accurate when it is considered that Osborne based that on a 50% interest, when he only held a ⅓ interest in the properties.

The real issue in this case is whether DFS reasonably relied upon the financial statement in light of its investigation of Osborne's assets and the information provided to DFS by Jeffers as to the true ownership interests and mortgages of Bo–Den. *Candland* states, *supra,* at 1471:

> Candland contends that INA could not reasonably rely on his assertions without investigation. Under the circumstances found here, we require little investigation. *Lansford,* 822 F.2d at 904; *see Prosser & Keeton,* § 108 at 752 ("assertions of fact as to . . . [the] financial status of corporations, and similar matters . . . may justifiably be relied on without investigation, not only where such investigation would be burdensome or difficult . . . but likewise where the falsity of the representation might be discovered with little effort by means easily at hand") (footnotes omitted). Following *Lansford,* we hold that whatever duty to investigate exists in this circuit, *see, e.g., Kentile Floors v. Winham,* 440 F.2d 1128, 1132 (9th Cir.1971), was easily satisfied in this case.

The duty to investigate, apart from actual investigation itself, is further explained in *Smith v. Lachter (In re Smith),* 242 B.R. 694, 702 (9th Cir. BAP 1999):

> This Panel has noted that, when there is evidence of materially fraudulent statements, little investigation is required for a creditor to have reasonably relied on the representations. *See In re Gosney,* 205 B.R. 418, 421 (9th Cir. BAP 1996), *aff'd* 161 F.3d 12 (9th Cir.1998) (citing *Candland,* 90 F.3d 1466, and *In re Lansford,* 822 F.2d 902, 904 (9th Cir. 1987)). *See also National Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 305 (2d Cir.1996) (citations omitted) (" 'Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B)' . . . is 'a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith.' ").

The reasonable reliance standard is determined on a case by case basis. *In re Bonnett,* 895 F.2d 1155, 1157 (7th Cir. 1989). And in determining the reasonable-

ness of the lender's reliance, the court may nevertheless consider the lender's conduct. As stated in *In re Morris,* 223 F.3d 548, 554 (7th Cir.2000):

> While we understand that the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors, such a precaution could be the ordinarily prudent choice in circumstances where the creditor admits that it does not believe the representations made by the prospective debtor. *See Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir.1993) (stating that when determining reasonable reliance, "[t]he bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations").

*Gertsch* restates the test:

> "Lenders do not have to hire detectives before relying on borrowers' financial statements. . . . '[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.'" [*In re Figge,* 94 B.R. 654, 666 (Bankr.C.D.Cal.1988] (*quoting In re Garman,* 643 F.2d 1252, 1260 (7th Cir. 1980))).

\*    \*    \*    \*    \*    \*

"Industry custom" [to investigate] is merely a guideline, and not an element that must be proven before reliance can be said to be reasonable. As noted in [*In re Cohn,* 54 F.3d 1108, 1117 (3d Cir.1995)], absent other factors, a creditor demonstrates reasonable reliance by

showing that it followed its normal business practices. *Gertsch,* 237 B.R. at 170.

The record in this case conclusively shows that DFS, in accordance with strict company policy, undertook an investigation of Osborne's reported assets. DFS employees not only did a phone check on ownership but further obtained a written lot book report on the real estate interests. What is puzzling about the results of the investigation is that the lot book report is missing. Surely that report would have revealed the true ownership interest of Osborne in the Ditman and Fowler properties as the grant deeds were on record since 1992 (Ex. 176–177) and deeds of trust had been recorded in 1994. Moreover, the credit approval report (Def.Ex. 102) was issued under date of December 5, 1995, with one signature by Edward Stefano. In that report, "Summary/Recommendation" based approval in part on the "Personal guarantee from ownership with TNW of over $3 MM". Ex. 102, p. 12, after setting forth on page 4 the data from the Clary spread report. Ex. 2, p. 1. Yet before the Business Financing Agreement and Addendum, plus the Personal Guaranty, were signed on February 1, 1996 (Exhibits 14, 15 and 16) making the credit facility effective, Eva Jeffers had met with Stefano to show the true ownership of Osborne and the Bo–Den indebtedness. Exhibits 176 and 177 were delivered to Stefano before the finalization of the financing agreements and guaranty. In sum, DFS had actual knowledge that the personal financing statement was false in that there were in fact additional mortgages against the home in favor of Bo–Den and that Osborne was only a ⅓ owner of the Ditman and Fowler properties.

Therefore from the testimony of George that telephone and written lot reports of ownership were obtained and that Stefano, a key employee in the entire transaction (Stefano resourced the loan), I conclude DFS proceeded with the credit facility, taking security in the ADF inventory and

accounts receivable, but not in the personal assets of Osborne, and did so without reasonable basis for reliance on the materially false personal financing statement of Osborne.

In this regard, I find George's testimony that his department searched tax records and verified Osborne's ownership, and discovered that Osborne's ownership was 100% as reported in the financing statement to be incredible and not worthy of belief, particularly where the written report has not been produced after being in DFS's custody at all times according to George. Further, George's trial testimony was impeached by prior deposition testimony on this subject. Yet, it was from this report and investigation that the personal financing statement went unchallenged as to ownership. I must assume from the testimony that lot books showing ownership were in fact received. This being the fact, DFS would have known at the outset of the loan process that the financing statement was false. No reasonable person would have relied on that information if it were so critical to the loan approval.

*In re Masegian,* 134 B.R. 402, 406–07 (Bankr.E.D.Cal.1991), citing *In re Allen,* 65 B.R. 752, 760 (E.D.Va.1986) specifically holds that reliance would be considered unreasonable if the creditor knew that the information on the financial statement was false. Further, reliance would be unreasonable where the creditor became aware of some information inconsistent with the accuracy of the financial statement. Therefore, once DFS, a sophisticated lender who undertook an aggressive investigation of the debtor's business and the personal financial statement, found that grant deeds and lot book reports showed ownership interests totally different than the 100% claimed by Osborne, its actual reliance on the statement became no reasonable reliance at all.

From the evidence, and particularly looking at the detailed "Credit Approval" prepared by DFS (Ex. 102) which was based on extensive audit of accounts receivable and inventory by DFS, it is obvious that DFS was completely satisfied to indulge in the credit facility based on security of ADF. The guarantor information covers but ½ page of the 12 page report and the final summary merely recites "Personal guarantee from ownership with TNW of over $3MM". If DFS was intent on actually relying on the financial statement as an important and integral part of the loan facility, the obvious inquiry becomes why DFS did not take recorded security interests in the guarantor's extensive real estate holdings? From the totality of the circumstances, it took the risk with ADF assets [9], and with Stefano's and George's knowledge of ownership interests different from the financial statement, it becomes obvious, as Osborne and Eva Jeffers testified, Stefano did not care about the Bo–Den loan on the residences, he only wanted to subordinate the Bo–Den mortgage to ADF assets. DFS's reliance on the financial statement was purely ancillary and superficial to the to the credit facility granted ADF, particularly when this sophisticated lender knew it was false. Thus, DFS's good faith on reliance is clearly brought into question.

Finally, in the brief of DFS is argues, for the first time (the issue is not in the Pre–Trial Order) that after default, DFS forebeared and continued to rely on the personal financial statement. Ex. 24, 26. Kulmacz stated that when default occurred (first by reason of an erroneous IRS levy), Osborne was granted an extension because Kulmacz relied on the personal guarantee of Osborne. Yet the default notices (Ex. 24 and 26) never mentions the guarantee. And if one assumes Kulmacz is truthful on this issue, his reliance on the personal financial statement was no more reason-

---

**9.** Defendant's Exhibit 102, DFS's Credit Approval of December 5, 1995, shows ADF had $3,609,000 of accounts receivable and inventory of $8.7 million, which was described as "strong inventory collateral" against a loan of $2.5 million.

able than DFS's prior reliance before funding the loan. In fact, Exhibit 26, signed by Kulmacz and Osborne, shows the extension is granted consistent with Osborne's request that ADF would secure additional financing from another lender, and nothing more! This hardly indicates any reliance on the personal financing agreement after default.

## CONCLUSION

While DFS has satisfied most elements of the *Siriani* test (# 1, 2, 3, 4 and 5), the plaintiff has failed to satisfy by a preponderance of credible evidence that DFS's reliance on the false financial statement was reasonable. George informed Kulmacz that Osborne owned several properties, some residential, but value appeared to be high. George insisted on going beyond just phone checks to verify the ownership to obtain a written report for the file. He did so. The report is missing and his bare statement that the lot books report substantiated the Osborne financial statement cannot be true. Ex. 176, 177. There was no reasonable reliance on the false financial statement after DFS found it was false and nevertheless proceeded with closing the loan facility. DFS standard of conduct under the facts of this case was to investigate and verify the truth of the financial statement. It did so. DFS then had to know the statement was false, both from the written lot report as to ownership and the copies of the grant deeds provided to Stefano. Acknowledging the low standard of conduct on the issue of *duty* to investigate, it is also established that a "creditor is not entitled to rely upon an obviously false representation of the debtor" when that knowledge of falsity comes to the attention of the creditor. *In re Garman*, 643 F.2d 1252, 1259–60 (7th Cir.1980). This case is not like *Lansford* or *Candland*, but is more parallel to *Morris* where the court affirmed the bankruptcy court finding that the creditor's reliance on a financing statement was not reasonable where the creditor's officer "had serious doubts about the truth" of the statement and the debtor's veracity. *Morris*, 223 F.3d at 554. Here, the investigation of lot book checks and the production of the grant deeds by Jeffers to Stefano were the "red flag" which flew brightly before the eyes of DFS's employees, and signaled that a prudent lender would realize the financial statement was not accurate. Having failed it its burden of proof on the issue of reasonable reliance, the complaint seeking non-dischargeability of the debt due DFS by the guarantor Peter Osborne must be dismissed.

IT IS ORDERED the Clerk shall enter Judgment in favor of the defendant Peter G. Osborne and against the plaintiff Deutsche Financial Services Corporation dismissing the complaint seeking non-dischargeability of plaintiff's debt under 11 U.S.C. § 523(a)(2)(B); with costs to the defendant.

**EXHIBIT H**

Personal Financial Statement

Principal: Peter G. Osborne
Dealer: Far West
Date:     05/01/95

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | 26.7 | Accounts Payable | 54.4 |
| *Accounts Receivable | | Loan/Note Pay. - Car | |
| Other Receivable | | Loan/Note Payable | |
| Loan/Note Receivable/ | | Payable to Business | |
| *Business Equity Rec. | 5139.8 | Miscellaneous Payable | |
| Securities - Listed | | Taxes | |
| *Securities - Unlisted | | Mortgages | |
| Other Investments | | Personal Residence | |
| *Personal Property | 50.0 | Income Property | 112.0 |
| Real Estate | | Business Property | 1317.8 |
| Personal Residence | 450.0 | Other- SBA Loan | |
| Income Property | 2875.0 | Other | |
| Business Property | 2050.0 | | |
| | | | |
| | | | |
| *Other | | | |

| | | | |
|---|---|---|---|
| TOTAL ASSETS | 10591.5 | TOTAL LIABILITIES | 1484.2 |
| | | REAL ESTATE EQUITY | 3945.2 |
| | | NET WORTH | 9107.2 |
| | | TANGIBLE NET WORTH | 3917.4 |
| | | TOTAL LIAB. & NET WORTH | 10591.5 |

Spread By:       Kathy Clary
Date:              11/28/95

Comments:

ELLS FARGO BANK

**BUSINESS LOAN DIVISION**

**PERSONAL FINANCIAL STATEMENT**

## PERSONAL PROFILE

| | AGE | SOCIAL SECURITY NUMBER |
|---|---|---|
| PETER G. OSBORNE | 34 | 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 |

| EET ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 2715 Frances | La Crescenta, | CA | 91214 |

| E PHONE | | AT CURRENT ADDRESS |
|---|---|---|
| 818) 957-1436  X OWN  RENT $_____ PER MONTH  OTHER _____ | | SINCE (MM/YY) June/ 92 |

| ARRIED  SEPARATED | NUMBER OF DEPENDENTS | AGES OF DEPENDENTS | YEARS WITH COMPANY |
|---|---|---|---|
| UNMARRIED | -0- | -0- | 12 |

| UE'S NAME | SPOUSE'S OCCUPATION | SPOUSE'S SOCIAL SECURITY NUMBER |
|---|---|---|
| N/A | N/A | N/A |

| USE EMPLOYED BY | HOW LONG WITH EMPLOYER? (SPOUSE) | SPOUSE'S WORK PHONE |
|---|---|---|
| N/A | YRS.  MOS.  N/A | (  )  N/A |

## BANKING RELATIONSHIPS (Please list only your personal accounts.)

| NAME OF BANK | ACCOUNT NUMBER | PERSONAL CHECKING | SAVINGS | CURRENT BALANCE |
|---|---|---|---|---|
| ank of America | 02238-06106 | x | | 21,200.00 |
| ells Fargo | 0948-010368 | x | | 5,450.00 |

## FINANCIAL STATEMENT

| ASSETS | AMOUNT | LIABILITIES | AMOUNT |
|---|---|---|---|
| SH IN WELLS FARGO BANK | 5,450.00 | TOTAL REVOLVING CREDIT  Wells Fargo | 39,000.00 |
| SH IN OTHER BANKS  Bank of Amer. | 21,200.00 | TOTAL INSTALLMENT LOANS  Chase Man. Bank | 15,436.00 |
| RETIREMENT ACCOUNTS  RA SEP KEOGH 401? | -0- | 1ST MORTGAGE ON RESIDENCE | -0- |
| TOCK / BONDS / MUTUAL FUNDS  NCLUDE COPY OF BROKER'S STATEMENTS) | -0- | OTHER MORTGAGES ON RESIDENCE | -0- |
| RESIDENCE MARKET VALUE | 450,000.00 | MORTGAGE(S) ON OTHER REAL ESTATE | 1,429,791.00 |
| OTHER REAL ESTATE MARKET VALUE  See Sch. "1" | 9,925,000.00 | OTHER LIABILITIES (PLEASE DESCRIBE) | |
| OTHER ASSETS (PLEASE DESCRIBE)  autos, etc. | 50,000.00 | OTHER LIABILITIES (PLEASE DESCRIBE) | |
| OTHER ASSETS (PLEASE DESCRIBE)  FARWEST  Daytona Ignition | 1,000,000.00  3,639,805.00 | | |
| OTHER ASSETS Other Assets  United Cores | 500,000.00 | TOTAL LIABILITIES | $1,484,227.00 |
| Total Assets | $10,591,455.00 | | |

NET WORTH (TOTAL ASSETS MINUS TOTAL LIABILITIES) $ 9,107,228.00

DO YOU GUARANTEE ANY OTHER DEBT  YES _____ NO X      IF YES, WHAT IS THE TOTAL: $ _____

WHO IS THE BORROWER? _____

NAME OF FINANCIAL INSTITUTION _____

## SECURITIES OWNED (If broker's ... is attached, leave blank.)

| SHARES OR ...AND AMOUNT | SECURITIES DESCRIPTION | REGISTERED OWNER | PLEDGED YES | NO | WHERE QUOTED | PRESENT MARKET VALUE |
|---|---|---|---|---|---|---|
| | N/A | | | | | |

## REAL ESTATE HOLDINGS (Attach separate schedule for additional properties.)

PROPERTY TYPES: SINGLE FAMILY (S), MULTIPLE FAMILY (MF), COMMERCIAL/INDUSTRY (C), LAND/ACREAGE

| | RESIDENCE ☐SF ☐MF | ☐VAC. ☐RENTAL ☐SF ☐MF ☐C ☐L | ☐VAC. ☐RENTAL ☐SF ☐MF ☐C ☐L | ☐VAC. ☐RENTAL ☐SF ☐MF ☐C ☐L |
|---|---|---|---|---|
| PROPERTY TYPE | | | | |
| PERCENTAGE OF OWNERSHIP | % | % | % | % |
| PROPERTY ADDRESS | | SEE SCHEDULE "1" ATTACHED | | |
| DATE PURCHASED | | | | |
| PURCHASE PRICE | | | | |
| ESTIMATED MARKET VALUE | | | | |
| 1ST MORTGAGE BALANCE | | | | |
| ALL OTHER MORTGAGES/LIENS | | | | |
| ANNUAL PROPERTY TAXES | | | | |
| MONTHLY MORTGAGE PAYMENT(S) | | | | |
| MORTGAGE MATURITY YEAR | | | | |
| GROSS MONTHLY RENT | | | | |

## GENERAL INFORMATION (If married these questions apply to both you and your spouse.)

YES ☒NO  Have you ever had a repossession?

YES ☒NO  Have you ever had a bankruptcy or had a judgement against you?

YES ☒NO  Have you ever been a principal or guarantor of a firm that declared bankruptcy?

YES ☐NO  Are any assets pledged or debts secured except as shown?

☐YES ☒NO  Are any assets held in a Trust? If yes, please include a copy of the Trust Agreement

☐YES ☒NO  Are you party to any claim or lawsuits?

☐YES ☒NO  Has there been an IRS audit in the past 3 years?

☐YES ☐NO  If yes, has the audit been settled?

If YES to any of the above, please explain: N/A

## SIGNATURES

For the purpose of obtaining or establishing credit from time to time, the undersigned certify that the above (attached) statement and supporting schedules, including all federal tax returns, prepared by or for the undersigned, are a complete and true statement of the financial condition of the undersigned on the date indicated. You are authorized to make whatever inquiries about the undersigned deemed necessary and appropriate for the purpose of evaluating the credit application provided, including inquiries to the Internal Revenue Service. You are also authorized to provide credit information about your credit experience with the undersigned to other creditors and credit reporting agencies.

AUTHORIZED SIGNATURE  PETER G. OSBORNE  DATE 5/1/95

X ___ SPOUSE'S SIGNATURE ___ DATE

NOTE: Spouse's signature required only if spouse is co-applicant

PETER G. OSBORNE

SCHEDULE "1"

OTHER
REAL PROPERTY SCHEDULE

| ADDRESS | OWNERSHIP | ESTIMATED MARKET VALUE | MORTGAGES |
|---|---|---|---|
| 1516 Princes Glendale, Ca. | 100% | $400,000.00 | -0- |
| 1716 Park Place Montrose, CA | 100% | $275,000.00 | $112,000.00 |
| 2728 Frances La Crescenta, CA | 50% | $125,000.00 (100%= $250,000.) | -0- |
| 2930 E. 44th st. Los Angeles, Ca | 100% | $1,200,000.00 | 664,349.00 |
| 1520 Ditman Los Angeles, Ca. | 100% | 900,000.00 | ) |
| 3419 Fowler Los Angeles, Ca | 100% | 850,000.00 | ) 653,442.00 |
| Fowler St. vacant lot | 100% | 87,500.00 | ) |
| Fowler St. vacant lot | 100% | 87,500.00 | ) |
| 270 acres. Mohave Dessert | 100% | 1,000,000.00 | -0- |
| TOTALS | | $4,925,000.00 | $1,429,791.00 |